644 So.2d 1168 (1994)
In the Matter of the EXTENSION OF the BOUNDARIES OF the CITY OF COLUMBUS, Mississippi.
Kenneth R. ROBINSON, Walter J. Cunningham, Ralph Edward Hall, J.B. Wilkins, Arnette Neil Beard, and Ed Markham
v.
CITY OF COLUMBUS, Mississippi.
No. 91-CA-00783.
Supreme Court of Mississippi.
June 23, 1994.
Rehearing Denied December 1, 1994.
*1170 James H. Herring, Herring Long & Ward, Canton, for appellant.
Dewitt T. Hicks, J. Gordon Flowers, Gholson Hicks Nichols & Ward, Columbus, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and PITTMAN, JJ.
DAN M. LEE, Presiding Justice, for the Court:

STATEMENT OF THE CASE
On April 18, 1990, the City of Columbus (City) filed a petition in the Chancery Court of Lowndes County seeking to annex approximately 33 square miles of land adjoining the municipality to the north, south and west. Objections were filed and the case proceeded to trial before Special Chancellor Robert P. Sugg. On June 20, 1991, Judge Sugg entered his judgment granting the petition as to a portion of the proposed annexation area equal to roughly ten square miles.
On appeal, the remaining objectors assign the following as error on the part of the lower court:
THE TRIAL COURT ERRED IN ALLOWING A LIMITED ANNEXATION BECAUSE THE CITY FAILED TO MEET ITS BURDEN OF ESTABLISHING THAT ANNEXATION WAS REASONABLE FOR THE LIMITED AREA.
The City duly perfected its cross-appeal, assigning the following as error:
THE TRIAL COURT ERRED IN DECLARING A PORTION OF THE REQUESTED ANNEX UNREASONABLE.
Applying the manifest error standard as we are bound to do, we find that lower court committed no reversible error and the judgment is affirmed on both the appeal and the cross-appeal.

STATEMENT OF THE FACTS
Prior to this annexation attempt, the City of Columbus included approximately 11.4 square miles within its boundaries. The proposed annexation area (PAA) consisted of an additional 33 square miles. As stated above, the lower court approved annexation of approximately ten square miles, increasing the area within the city limits to roughly 21.4 square miles.
The City's current expansion efforts began when the Utility Commission ordered a study to evaluate the feasibility of annexation. The Utility Commission is an autonomous agency whose members are appointed by the City Council. The study was conducted by Mike Bridge and eventually presented to the City Council. Although Bridge's feasibility study indicated that the City could successfully annex a large portion of Lowndes County, the Council decided not to pursue annexation on such a large scale. Accordingly, Bridge was directed to revise his figures to reflect a smaller area selected by the Council. The second study concluded that expansion into the revised area was also feasible. After receiving Bridge's report on October 25, 1989, the Council moved to direct the City *1171 Engineer to draft a description of the proposed annexation and to instruct the City Attorney to draft an appropriate ordinance.
On February 6, 1990, the Council voted to accept the proposed ordinance and place it on file in accordance with state law. A public meeting was subsequently sponsored by the City to address the concerns of interested parties. Finally, on February 27, 1990, the Council voted on the annexation ordinance. The Council members split on the vote with three in favor and three opposed. The mayor cast the deciding vote in favor of the ordinance.
On April 18, 1990, the City filed its "Petition for Approval of the Extension of the Boundaries of the City of Columbus, Mississippi" in the Chancery Court of Lowndes County. An answer and objection was filed by several hundred residents of the proposed annexation area under the style Barry L. Milling, et al.
Special Chancellor Robert P. Sugg conducted a three week trial before concluding, in a written opinion that:
The Court is concerned because no estimate of the cost of all the capital improvements promised has been forthcoming. The only estimate of the cost came from the objector's expert and it only dealt will [sic] the cost of sewer lines which he estimated at $7,759,000. His estimate did not include the cost of acquiring water and sewer district physical assets and value as a going business, nor the cost of acquiring electric utility assets in the PAA.
Columbus is in excellent financial condition, but there is a limit to its ability to borrow for capital purposes. The Court is of the opinion the City should have provided it with reliable estimates of the total cost to the City of the annexation in order to meet the burden of showing reasonableness. Otherwise, the Court has no way of knowing if the City can finance the proposed capital improvements within the entire PAA.
This failure of proof on the part of the City ultimately led the lower court to approve only a portion of the area requested in the petition. Partial approval is specifically authorized by Miss. Code Ann. § 21-1-33 (1972).
The remaining objectors filed an appeal asserting that the Chancellor erred in granting even a portion of the proposed annexation. The City filed a cross-appeal arguing that the entire proposed annexation should have been approved.

DISCUSSION

I. THE APPEAL

THE TRIAL COURT ERRED IN ALLOWING A LIMITED ANNEXATION BECAUSE THE CITY FAILED TO MEET ITS BURDEN OF ESTABLISHING THAT ANNEXATION WAS REASONABLE FOR THE LIMITED AREA.

The Law.
As this Court's precedents make clear, "Annexation is a legislative affair." See Matter of the Boundaries of City of Jackson, 551 So.2d 861, 863 (Miss. 1989). Confirmation of annexation attempts, however, is within the purview of the Chancery Court. See Miss. Code Ann. § 21-1-33 (1972). This has not always been the case. See Western Line Consol. School Dist. v. City of Greenville, 465 So.2d 1057, 1059 (Miss. 1985).
As the law now stands, "The judicial function is limited to the question whether the annexation is reasonable." Jackson, 551 So.2d at 863. Reasonableness is determined by analyzing twelve factors announced by this Court in prior cases to see what they "indicate." Id. This approach has been criticized as arbitrary for failing to provide adequate guidelines for reaching the ultimate determination. See In the Matter of the Enlargement of the Corporate Limits and Boundaries of the City of Gulfport, 627 So.2d 292 (Miss. 1993), (Smith, J., dissenting, "I am convinced that the test has been expanded so far that now it is absolutely meaningless."); Matter of Boundaries of City of Vicksburg, 560 So.2d 713 (Miss. 1990) (Sullivan, J. dissenting, "`Reasonable' is now determined by the length of the chancellor's nose, or foot, if you prefer."); Matter of the Boundaries of *1172 City of Jackson, 551 So.2d 861, 878 (Miss. 1989) (Blass, J. dissenting, "[T]he proliferation of `indicia of reasonableness,'... can only lead one to the conclusion that `indicia of reasonableness' are either now devoid of substance or so malleable as to be meaningless."). Although we retain our "indicia" for the purposes of today's decision, we emphasize that fairness to all parties has always been the proper focus of our reasonableness inquiry. Thus, we hold that municipalities must demonstrate through plans and otherwise, that residents of annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness.
The Court has enumerated and explained the current list of indicia as follows:
In a series of cases beginning with Dodd v. City of Jackson, 238 Miss. 372, 396-97, 118 So.2d 319, 330 (1960) down through most recently McElhaney v. City of Horn Lake, 501 So.2d 401, 403-04 (Miss. 1987) and City of Greenville v. Farmers, Inc., 513 So.2d 932, 941 (Miss. 1987), we have recognized at least eight indicia of reasonableness. These include (1) the municipality's need for expansion, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) the potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) the need for zoning and overall planning in the area, (6) the need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, and (8) the past performance and time element involved in the city's provision of services to its present residents.
Other judicially recognized indicia of reasonableness include (9) the impact (economic or otherwise) of the annexation upon those who live in or own property in the area proposed for annexation, Western Line, 465 So.2d at 1059; (10) the impact of the annexation upon the voting strength of protected minority groups, Enlargement of Boundaries of Yazoo City v. Yazoo City, 452 So.2d 837 at 842-43 (Miss. 1984); (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and in the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the (economic and social) benefits of proximity to the municipality without paying their fair share of taxes, Texas Gas Transmission Corp. v. City of Greenville, 242 So.2d 686, 689 (Miss. 1971); Forbes v. Mayor & Board of Aldermen of City of Meridian, 86 Miss. 243, 38 So. 676 (1905); and (12) any other factors that may suggest reasonableness vel non. Bassett v. Town of Taylorsville, 542 So.2d 918, 921 (Miss. 1989).
Matter of the Boundaries of City of Jackson, 551 So.2d 861, 864 (Miss. 1989); see also, Bassett v. Town of Taylorsville, 542 So.2d 918, 921-22 (Miss. 1989).
As we have frequently reiterated, these factors are not to be treated as separate, independent tests but rather as mere indicia of reasonableness, and that the ultimate determination must be whether the annexation is reasonable under the totality of the circumstances. See Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d 814, 819 (Miss. 1991); Matter of Boundaries of City of Vicksburg, 560 So.2d 713, 716 (Miss. 1990); In re Enlargement of Corporate Boundaries of the City of Booneville, 551 So.2d 890, 892 (Miss. 1989); In the Matter of the Extension of the Boundaries of the City of Jackson, Mississippi, 551 So.2d 861, 864 (Miss. 1989); Bassett v. Town of Taylorsville, 542 So.2d 918, 921-22 (Miss. 1989).
Moreover, we have stated:
While the Dodd and Renfro criteria are helpful, they were never intended to be conclusive as to reasonableness... . The economic and personal impact on these landowners is as important a concern as the city's need to grow. Only by reviewing the annexation from the perspective of both the city and the landowner can the chancellor adequately determine the issue of reasonableness. In short, the common thread that must run through any reasonableness criteria is fairness. An unreasonable annexation is an unfair one and, as *1173 fairness is the foundation of equity, an annexation cannot be both unreasonable and equitable. The converse is equally true for an annexation cannot be both inequitable and reasonable.
Western Line, 465 So.2d at 1059-60 (emphasis added).

Standard of Review.
"This Court's standard of review is very limited. The Court can only reverse the Chancery Court's findings as to the reasonableness of an annexation if the chancellor's decision is manifestly wrong and is not supported by substantial and credible evidence." See Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d 814, 819 (Miss. 1991) (citing Matter of Boundaries of City of Vicksburg, 560 So.2d 713, 716 (Miss. 1990).
"[I]f there is credible, albeit conflicting evidence, this Court will defer to the Chancery Court's findings. In the context of conflicting evidence, this Court will not disturb a lower court ruling unless it can be said that from all the evidence such findings are manifestly wrong." Id.

Review of the Indicia.

(1) Need to Expand
The lower court described the geographic situation of the City as follows:
Columbus lies between the Tombigbee and Luxapalila Rivers and as shown on Exhibit P-187, a majority of the land within the city limits is within either in a floodway or a floodplain. A floodway is water above the level of the banks of a stream flowing with force. A floodplain is the area inundated when the water reaches the 100 year flood level. In addition, wetlands likely exist at the outer edges of the floodplain shown on the map.
The lower court found that of the 7,296 total acres within the City, 1,535 were vacant. However, of the vacant acres, 598 were located in the floodway and 782 were in the floodplain leaving 155 "vacant, developable acres." Some of the vacant acres have been dedicated to the use of the Mississippi University for Women, leaving a final total of 88 acres available within the City.
The evidence presented at trial led the lower court to find:
The need for expansion by the City is not seriously challenged by the objectors. Columbus is the economic hub of Lowndes County and it is to the interest of Lowndes County and the area's residents for the City to continue to be a thriving viable center for shopping, medical care, cultural activities and municipal services that are available in the City.
The Court finds there is a need for the City to expand its boundaries.
The objectors present the following argument in opposition to the chancellor's conclusion on this indicium:
Using the criteria of vacant developable lands set forth by the City (and accepting its figures as to the acreage designated as wetlands), it is apparent that a significant portion of the area approved for annexation is undevelopable.
It is submitted that if the City's need is for vacant developable land, the area which is approved for annexation will not meet that need.
The City counters with testimony offered at trial by various civic leaders that supports the lower court's finding that "practically all of the developable land within the City has been utilized."
The argument posited by the objectors does not refute the lower court's finding on the need to expand but rather attacks the logic behind the particular expansion granted.
The testimony of Mayor Hayslett, other high level City employees, and both the City's experts on annexations constituted substantial credible evidence, sufficient to support the lower court's ruling under the applicable manifest error standard.

(2) Path of Growth
The lower court described the commercial and residential development occurring to the north, south, and west of the city limits as they existed prior to this case. The chancellor then held:
By way of summary, the PAA to the north, West along Wilkins-Wise Road, the *1174 area from Highway 82 North to the Waverly Ferry Road, the South area are all reasonably within the path of growth, but sever [sic] constraints to development because of floodways, floodplains, or wetlands.
The argument of the objectors on this indicium is that the development in the PAA occurred in spite of rather than because of the proximity of the City. Thus, they argue, "[I]t is not sufficient for a City to say (and a path of growth is not created if) growth has occurred in an area unless the City has played a significant role in creating that growth." (emphasis added). The objectors cite City of Greenville v. Farmers, Inc., 513 So.2d 932, 934 (Miss. 1987), as support for this proposition.
The City again counters by recounting testimony of the mayor, the local postmaster and several city employees in support of the chancellor's finding. Specifically, Mayor Fred Hayslett testified:
[As to the South]
We have an existing industrial park just South of the City Limits that consist of GEN-CORP and some other areas. You have got a City Housing Authority, public housing area that is in this area here. We have got residential development that is taking place... .
[As to the West]
This is the Port and the local Port Authority and the proposed jail is to be in this area... . Up here on Wilkins-Wise Road leading out to the Lock and Dam[,] [t]here is already a lot of commercial development taking place... .
[As to the North]
There is a tremendous amount of residential development already in place right in here... . [T]he Main Post Office is now built here. You have got the South Central Bell offices out there on Bluecutt, next to the Main Post Office building. At the intersection of Bluecutt Road and Highway 45, UniSouth Bank has built their main office and their operations center. National Bank of Commerce has built a new branch bank there.
Additionally Mike Bridge, the City's primary expert testified that, in his opinion, the City's path of growth "is in every direction of the area or into the areas that it seeks to annex at this time."
The argument of the objectors is based on the following language found in a lengthy quote from the lower court's opinion in the Greenville case:
Considered as a whole, the City of Greenville's "need to expand" is not the result of increasing population, but is the "urban sprawl" that has occurred outside the present city limits as a consequence of economics, and a deliberate policy, participated in by the City, permitting lands outside the corporate limits to develop urban character, utilizing municipal services.
Greenville, 513 So.2d at 934 (emphasis added).
Suffice it to say, we did not endorse the "deliberate policy" comments of the lower court nor did we rely on those comments in reaching our conclusion.
The testimony set out above constitutes substantial credible evidence in support of the lower court's finding. Consequently, the chancellor committed no manifest error in holding that this particular factor favored reasonableness.

(3) Natural Barriers
With respect to this indicator, the lower court found:
There are no natural barriers between the City and the PAA. However, there are some constraints on development because of the floodplains, floodway and steep slopes in the areas proposed to be annexed.
The objectors point to the Tombigbee River and the floodplain as two natural barriers indicating that the City's annexation plan is unreasonable. They cite Extension of Boundaries of Horn Lake v. Renfro, 365 So.2d 623, 625 (Miss. 1978) in support of this proposition.
The City, on the other hand, agrees with the lower court's general finding of no natural barriers but takes sharp issue with the statement regarding constraints on development. *1175 It argues that if the chancellor based his decision to reduce the annexation on the existence of these "constraints" then he was in error. However, there is nothing in the lower court's ruling to indicate that the existence of the constraints within the PAA was a factor in his decision to reduce the annexation.
Reference to this Court's earlier experiences with natural barriers shows that it is not a constraint upon development that establishes unreasonableness under the natural barrier concept but rather a condition that makes provision of municipal services impossible or prohibitively expensive. See City of Biloxi v. Cawley, 332 So.2d 749, 751 (Miss. 1976) ("Annexation of the territory north of Biloxi Bay would necessitate some duplication of facilities and personnel in order to render the services proposed by the ordinance of annexation."), see also, Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d 814 (Miss. 1991) (Chancellor was not manifestly in error in observing that certain man-made barriers such as the interstate and the county line should not be ignored.); Extension of Boundaries of Horn Lake v. Renfro, 365 So.2d 623, 625 (Miss. 1978) (Existence of floodplain between existing city limits and portions of proposed annexation could properly be considered to militate against finding of reasonableness.).
In the current case the chancellor found that there were no natural barriers between the City and the PAA that would interfere with provision of municipal services. This finding is supported by testimony from Mike Bridge, the City's expert, to the effect that:
There are no natural barriers that would prohibit the City from providing the full range of municipal services and facilities to the area sought to be annexed... . If you will observe the exhibit [P-187], you will see that the City is bisected and traversed by substantial flood plain and floodway areas. This [has] not impeded in any way, whatsoever, the ultimate service by the City to the areas within the municipality.
Accordingly, the finding on this indicator is not manifestly erroneous.

(4) Potential Health Hazards.
With respect to this indicator, the lower court stated:
The Court finds that there is a need for adequate sewer treatment facilities in the area to be annexed to the north. Columbus has a sewer treatment plant running at less than 50 percent of capacity and the Columbus plant would be able to handle the discharge from septic tanks and sewer districts at the present time and for many years in the future.
.....
Exhibit P-180 and P-112 show solid waste hazards that existed in the annexation area on the date the photographs were taken. The objectors showed photographs of solid waste hazards existing within the City. Several of the witnesses agreed that solid waste was a continuing problem both in the County and City. However, the City addresses its problem more systematically than the County and although the population of the City is denser than the PAA, more solid waste hazards exist in the PAA than in the the [sic] City. The Court finds that the City will deal with the problem of solid waste better than the County in the PAA.
The evidence introduced at trial on both sewage and solid waste disposal was conflicting. In addition to Mayor Hayslett and Mike Bridge, the City offered the testimony of Joe Brown, the Chief of the Bureau of Environmental Health, a subdivision of the State Department of Health. Specifically, Joe Brown testified that with greater development to the north, the City's drinking water could be contaminated by sewage originating in the PAA.
The objectors argue persuasively that the existence of health hazards in the PAA should be irrelevant unless the City is planning to remedy the hazards. The annexation ordinance called for installation of sewer lines "within a reasonable amount of time not to exceed five years where necessary and economically feasible." The objectors point to the City's minimal planning and the subjective "economically feasible" wording in the ordinance and assert that, "[I]t makes no *1176 sense to cite potential health hazards as a reason for annexation when no solution to the potential problem is offered." The chancellor obviated this point to a large extent by confirming annexation only in areas where the economic feasibility formula offered by the city was easily met, and consequently residents are assured of receiving sewer service.
Prior cases establish the existence of potential health hazards as a circumstance supporting the reasonableness of an annexation. There was conflicting evidence as to both the existence of such problems and the City's commitment to implementing solutions. Accordingly, the chancellor's finding on this indicator was not manifestly erroneous.

(5) Financial Ability to Provide Promised Services
The following is the lower court's finding on this indicator:
The Court has examined numerous exhibits pertaining to the finances of the City, including but not limited to the audits for the fiscal year ending 1989 for the City, for the Electric Division and Water Division. Exhibits P-166, P-172, P-246, P-253, P-109, P-116, P-305 and P-316.
The City has general obligation bonds outstanding in the amount of $1,250,000. The Water Division has revenue bonds outstanding of slightly in excess of $1,500,000. and the Electric Division has no outstanding revenue bonds.
The City carries forward approximately a half million dollars operating funds from one year to the next. The Water Division has in excess of $1,000,000. and the Electric Division has in excess of $4,500,000. in cash or investments as a reserve fund.
The assessed valuation of all the property inside the City for the year 1990-91 is $90,587,455.00. The remaining capacity for general obligation bonded debt at 10% of the assessed valuation is $7,808,745.00 without including the assessed valuation of property in the PAA.
Funds have been set aside to take care of the cost of the $1,260,000.00 sewer improvement presently underway in the City.
The Court finds that the City is in excellent financial condition.
The objectors point out the following in their argument on this point:
[S]ince no road or bridge improvement program is offered; no utility service is offered; and no cost estimate is given for the delivery of such services, it is impossible to state whether the City would have the financial ability to deliver municipal services if such capital improvements were actually made.
The City countered by offering the opinions of the mayor, the head of the independent Utility Commission, and two experts on city planning (Grubbs and Bridge), all to the effect that the City could afford to provide the services promised in the annexation ordinance.
The lower court accepted the objectors' contention on this indicator at least insofar as the original proposed area was concerned. However, from the finding quoted above on this indicator and the order approving part of the proposed enlargement, it is obvious that Judge Sugg concluded that the City could afford the promised services in the area actually approved:

The Court is of the opinion the City should have provided it with reliable estimates of the total cost to the City of the annexation in order to meet the burden of showing reasonableness. Otherwise, the Court has no way of knowing if the City can finance the proposed capital improvements within the entire PAA.
.....
However, because of the many indicia of reasonableness heretofore discussed in some detail favorable to the City's position, the Court is of the opinion that the annexation should be approved in part.
These two statements are apparently inconsistent. On the one hand the chancellor found that the City could afford a reduced annexation while on the other hand he specifically found reliable estimates of projected costs (which were not forthcoming) to be an integral element in establishing reasonableness. The obvious question is how could the lower court determine that the City could *1177 afford a limited annexation without reliable cost estimates? The answer is that Judge Sugg applied the City's policy on extending water and sewer service for himself and determined where the City would be likely to provide services. (Opinion of the Court 21). The annexation was then limited to these areas. As will be further discussed below, the City's inability to demonstrate adequate planning is troubling. However, we are convinced that the "excellent financial condition" found by the lower court translates into an ability to pay for the necessary improvements in the approved area.

(6) Zoning and Overall Planning
The lower court found that this indicator points toward reasonableness, stating:
The City has a zoning ordinance, sewer ordinance, animal control ordinance, flood ordinance, subdivision ordinance, housing code, and building code. All were adopted to promote the health, general welfare of the City residents and to protect property uses within the urban area.
The County has a flood ordinance, a building code, a requirement that roads and subdivisions to be dedicated to the County be built to County standards, and a zoning ordinance limited to the Island.
The County enforced its building code since October, 1990 after beginning courtesy inspections in July, 1990. The Inspection Enforcement Department of the County consists of two people, one hired in January, 1990, and the other in July. The City has four inspectors and plans to add two more if the annexation is approved.
.....
William A. Luecke, Superintendent of the Building and Inspection Department of the City, testified about the manner in which the City has addressed the matter of dilapidated buildings. In the last ten years, more than 340 buildings have been demolished, 90 cases are pending and the City is aggressively following a program designed to remove dilapidated buildings. The City works with the owners to rehabilitate and refurbish houses in the City. In the last five years, 1,802 permits have been issued for that purpose.
.....
The objectors stated they did not need zoning and the County could adopt a zoning ordinance if the need arose. Supervisor Williams stated that there was no great outcry for zoning in the County. However, as early as 1976, Golden Triangle Planning and Development District recommended county-wide zoning (Exhibit P-34), but no comprehensive zoning plan has been adopted.
The Court finds that there is a need for zoning and overall planning in the PAA because of the density of population and commercial and industrial development adjacent to the present City limits.
As the lower court noted, the objectors challenge this finding by asserting that Lowndes County has various regulations that are sufficient to satisfy any need for zoning in the PAA.
The City counters, in its brief, with testimony from William Leucke, Superintendent of the Building and Inspection Department of the City, and Mike Bridge to the effect that incompatible land uses exist and need to be addressed in the PAA. Further, they stated that the City is better suited to enforce zoning regulations.
The testimony was conflicting on this point, and accordingly, the chancellor's finding of a need for zoning can not be disturbed.

(7) Need for Municipal Services
The following are pertinent excerpts from the lower court's finding on this indicator:
The area immediately North of the City limits is densely populated and no serious argument can be advanced against the need for municipal services in that area.
.....
The City, in Exhibits P-6, 7, 8, 9, and 306 has shown careful planning about the manpower and the equipment needs in the Police Department, Street Department and Fire Department for the PAA. The City will provide garbage pickup twice a week, *1178 trash pickup once weekly, scheduled mosquito control, a higher level of fire protection, a higher level of law enforcement and a more intense effort to remove solid waste.
.....
Reasonableness is suggested in the municipal level services offered by the City in the area proposed to be annexed.
The objectors do not question that the level of those municipal services listed above will increase if annexation occurs. Rather they confine their argument to the point that these incremental services are not needed.
The City, in its brief calls the Court's attention to the ample testimony in the record that tends to establish that police protection, fire protection, mosquito control, and garbage service would be better after annexation.
While it is impossible to conclude that the lower court was manifestly in error on this point, it is equally difficult, based on the evidence in the record, to see how this indicator has any relevance for determining the reasonableness of the limited annexation. The "need" for increased services of these types is at best very subjective. To simply state that such services will be more available begs the question as to whether such incremental increases are actually needed. Many of the hundreds of objectors in this case testified that as individuals they recognize no need for "improvement" with respect to these specific services. Likewise, the City produced some residents of the PAA that supported annexation precisely because they perceived a need for greater municipal services. While a general referendum would suffice, there is no manageable judicial method for determining the subjective needs of a diverse group of citizens. Accordingly, at least in this case where the PAA is not totally lacking such services, this factor deserves very little consideration.

(8) Past Performance
The lower court found that this indicator also weighed in favor of the City. Specifically, the chancellor held:
The City has been brought to task severely for failing to provide sewer to residents in a portion of the 1979 annexation area until the present time. Installation of the remaining sector of the sewer along Lemberg Road is nearing completion. In most of the 1979 annexation area, the sewer service has been in place for many years. The City's reason for not providing sewer service along Lemberg Road is twofold.
First, in 1979 Mayor Trotter requested a study of Magby Creek by the Corps of Engineers to help alleviate flooding along Magby Creek. This study was completed in 1986, and as ex-Mayor Trotter testified, the City didn't want to install the sewer lines and have to remove them at great expense.
Second, the Highway 82 bypass that crosses Lemberg Road near Magby Creek has been under construction a number of years. The Highway 82 project will cost about $40,000,000. and when completed will give access to the City from the East by a modern four-lane highway.
The other area where sewer lines are now being installed are on Military Road at the Highway 82 Bypass. Sewer service will soon be available in that area. When this project is completed, the need for any area in the City to be serviced by septic tanks will be eliminated for all practical purposes.
In spite of the sound of fury of the objectors who were not personally affected by this delay, the delay was not unreasonable. The other services promised in the 1979 annexation were timely provided.
The objectors dispute this finding with the testimony of their expert that the Magby Creek realignment project was not a sufficient excuse for delaying sewer installation in portions of the 1979 annexation until 1991. According to Mr. Elliott any competent engineer could have formulated a plan that would have provided sewer service to residents while simultaneously keeping future relocation costs at acceptable levels. They also point out that certain drainage improvements recommended in 1971 to alleviate flooding problems were never implemented. The result *1179 is that flash flooding remains a problem within the City limits.
The City asserts that all services promised in the 1979 annexation were promptly provided except those delayed by extenuating circumstances. Mike Bridge testified to this at trial:
The City, in each of its annexations, has provided the services as set forth in the ordinance of annexation. In the 1979 annexation, we did have a situation with the realignment of and the work by the Corps of Engineers on Magby Creek... . I might point out that as a corollary in the Jackson annexation, it has been recognized, certainly by the Court, that there are extenuating circumstances that may exist that would delay and rightfully so, expensive extension of services into areas, particularly if those services would have to be modified.
The case referred to by Bridge is In the Matter of the Extension of the Boundaries of the City of Jackson, 551 So.2d 861 (Miss. 1989). The case does not go as far as represented in the above testimony. Rather, in Jackson this Court chose to ignore the poor prior record of that city because the annexation under consideration was not comparable to prior ones.
There was conflicting testimony on the City's track record and, consequently, the lower court cannot be said to be manifestly erroneous. However, it is troubling that the arguments of the objectors were belittled as "the sound of the fury." Similar language was first used in Jackson, 551 So.2d at 867, to effectively negate this factor as an indicium in that case. Of course, this item remains a viable indicator, and there exists no express or implied requirement that objectors be personally affected by prior delays in order to offer them at trial.

(9) Impact on Property Owners
We have offered the following explanation of this indicator:
Here the Court is required to balance the equities by comparing the City's need to expand and any benefits accruing to residents from the annexation with any adverse impact, economic or otherwise, which will probably be experienced by those who live in and own property in the annexation area. The mere fact that residents and landowners will have to start paying city property taxes is not sufficient to show unreasonableness.
Jackson, 551 So.2d at 867-8.
Of course, as equity and reasonableness are equivalent, the fairness of a given annexation is the ultimate question that we seek to answer. Western Line Consol. School Dist. v. City of Greenville, 465 So.2d 1057 (Miss. 1985). Thus, it appears that in Jackson we introduced an element of confusion into our analysis. To remedy this, we repeat that reasonableness (i.e. fairness) is the test for whether a proposed annexation should be approved. The various indicia relied upon in the past are best understood as tools, useful in that they tend to establish or refute reasonableness. Consequently, there is little to be gained from analyzing this "indicium" separately.
Nevertheless, some of the lower court's comments under this heading are relevant to our review. Specifically, the lower court found that the increased tax burden on residents in the PAA would be somewhat offset by savings on fire insurance premiums and telephone rates. Furthermore, the chancellor found that the annexation area "would enjoy municipal services, including an increased level of fire protection, police protection, street maintenance, garbage pickup twice per week, trash pickup once per week, street lights, regularly scheduled insect control and other municipal services provided by the City."
Another important consideration for the lower court was the fact that City property owners pay approximately 44% of the property taxes collected by Lowndes County. Thus, according to the chancellor, "The general County fund covers many services that the objectors say the County is furnishing, but conveniently overlook the fact that City taxpayers are paying 43.63% of the cost of the services." These items do tend to establish reasonableness.

*1180 (10) Dilution of Minority Voting Strength

The lower court found that there would be "some" dilution of the voting strength of Columbus's black citizens. Judge Sugg was of the opinion that the dilution from 51% according to the 1990 census to an estimated 45% would not be sufficient to make the annexation unreasonable:
It would be useless for this Court to speculate on the outcome of a class action if any were filed. However, in view of the overwhelming need for the City to expand its boundaries and the adverse effect on the City and its residents (a majority of whom are black) if some expansion is not approved, the Court doubts expansion would be prohibited because of some dilution of the black vote.
The objectors raise this issue only to question the City's credibility. Any equal protection considerations raised by the City's ordinance are wholly irrelevant to the current appeal. For one thing, no affected party has challenged the legislation. Thus, the Court would be commenting on an issue without the benefit of effective advocacy for both sides. Furthermore, in those cases where dilution of voting strength is truly in dispute, the litigants are entitled to a full scale constitutional review. The manifest error standard used for evaluating reasonableness is far too lax for such inquiries. Accordingly, this indicium should not generally be afforded great weight in those cases where it is not raised by a party with standing.

(11) Enjoyment of Benefits from the City Without Paying Fair Share of Taxes
The lower court made no finding on this indicium. The value of this item as an indicator of reasonableness is questionable because it is difficult to envision a situation where an individual's "fair" share of taxes is greater than the amount required by law. Residents of the PAA pay required county taxes as well as sales taxes when they buy goods in Columbus. Fairness requires no more.

(12) Other Factors Affecting Reasonableness
The lower court analyzed three separate components as relevant to the reasonableness determination. They were (a) the existence of certificated utility providers, (b) capital improvements, and (c) failure to provide adequate planning.

a. Certificated Utility Service Areas.
The lower court found as follows on this issue:
North of the City are two certificated water service areas (Exhibit P-194) and seven certificated sewer service areas (Exhibit P-197).
East Lowndes is the largest water service district and serves most of the PAA North of the City. Dixie Land and Water Co. Inc. is the other water service district in that area. In order to provide water service in the two districts, the City would have to purchase the physical assets and the certificate rights from the Districts.
The City entered into negotiations with Dixie, but did not reach an agreement. After annexation, the City would have the right to acquire Dixie by eminent domain. However, it would not have the same right to acquire East Lowndes because East Lowndes is indebted to the Farmers Home Administration. Under existing law, the City cannot file eminent domain proceedings as long as the District is indebted to the FHA.
If the City is unable to purchase the part of East Lowndes in the annexed area, several problems would arise.
First, in order for the City to maintain its Class 5 fire rating, it will be necessary for some of the water lines in the PAA be increased in size. As one witness put it, "the lines will have to be beefed up." It will also be necessary to install additional fire plugs to maintain the rating. No estimate of the cost was given.
Second, upon installation of sewer lines in the area, the amount of the monthly sewer charge would be difficult to ascertain and collect. The present sewer charge in the City is a percentage of the charge for water used and if the bills are not paid service is discontinued. When water service is discontinued, the sewer *1181 service is automatically discontinued because no water flows into the lines. The City will not be able to cut off the water supply so the only alternative would be to put a cut off on the sewer service line to each customer. A serious health hazard would be created as a result of cutting off the sewer service without cutting off water service at the same time. An alternative would be to contract with the District to bill and collect the sewer charges. This is not an insurmountable problem, but it militates against approval of the annexation in its entirety.
The same situation exists with respect to electric service. The objectors assert that the City will be unable to provide a full range of municipal services in the PAA because of the existence of certificated water, electric, and sewer companies.
The effect of this situation is somewhat mitigated by the fact that City light and water service is wholly supported by user fees so that citizens not enjoying the services are not forced to contribute to the upkeep of the City's utility division. However, with multiple providers, there is no guarantee that these services will be provided to all City residents at comparable rates. Thus, some citizens of the PAA may be forced to pay higher utility rates than current City residents without a corresponding reduction in city taxes. The chancellor further limited the potential impact of this situation by cutting back the area actually approved. Presumably, this will make acquisition of provider rights easier. On balance it does not seem that the chancellor was manifestly erroneous in his treatment of this issue.

b. Failure to Implement Capital Improvements.
The chancellor stated:
The objectors argue that the City has ignored its own comprehensive plan (Exhibit P 318) and that it would cost in excess of $60,000,000. to complete the capital improvements recommended. Sam Head, General Manager of the Light and Water Department, testified about the water and sewer improvements made by the City within the last few years. A map showing the improvements made by the City was introduced. (Exhibit 319) He stated that the improvements were not made exactly as recommended, but the changes in the location of pipes and sizes adequately met the needs addressed by the recommendations. With reference to the water storage tank recommendations, the City built one 2,000,000 gallon elevated storage tank instead of two 1,000,000 gallon tanks. The improvements as constructed substantially compy [sic] with the recommendations.
Ex-Mayor Trotter testified extensively about the drainage improvements made by the City made during his 16 year tenure as Mayor. Exhibit P 336 summarizes his statements about drainage improvements. Each year during his administration there was a line item in the budget for capital improvements. In most of the drainage improvements, earth channels were substituted for concrete channels and the sizes of some of the pipes was changed.
The argument about the capital improvements was raised by the objectors for two reasons. First, to show that the City furnishes a minimum of services and that it would not be in an excellent financial condition if all the improvements had been made as recommended. Second, to show that the City has not provided adequate services for its residents.
Although the recommendations were not followed exactly and a few have not been completed, the City has adequately addressed the recommendations.
The objectors offer nothing new in opposition to the chancellor's finding that this factor weighs in favor of the City. The chancellor's finding was supported by the testimony cited above and was not manifestly erroneous.

c. Poor Planning.
The lower court made the following comments on the City's planning with respect to this annexation:
The installation of water and sewer lines and utility services proposed in Section 3(a) and 4(i) are proposals for improvements *1182 demonstrating poor planning on the part of the City. In fact there was almost a total lack of planning on the part of the City with reference to these items.
The City did not prepare a preliminary engineering study of the cost or location of water and sewer lines in the PAA. The only estimate of the cost of sewer lines was prepared by objector's expert. It would have been relatively easy and inexpensive for the City to have prepared an estimate of the cost of and location of the capital improvements with reference to the utility service to the PAA.
In the absence of such estimate the Court is left with the City's policy with reference to extending water and sever [sic] service as shown in Exhibit P 290.
The policy is that the Light and Water Department will address providing water and sewer service when one of three conditions exist. The conditions are economic feasibility, danger to public health, and threat to the public water supply.
Economic feasibility is determined by the Department under the formulas shown in the Exhibit. Basically, revenue from new water and sewer lines must be sufficient for the capital outlay to be liquidated from revenue.
.....
Three members of the City Council and all members of the Utility Board testified in rebuttal that they would pledge their support to see that all of the improvements and services proposed in Sections 3 & 4 of the Ordinance would be put into place as soon as possible. They are well intentioned people, but the fact remains that they have no idea of the total cost of proposed utility improvements in the entire PAA.
The Court is concerned because no estimate of the cost of all the capital improvements promised has been forthcoming. The only estimate of the cost came from the objector's expert and it only dealt will [sic] the cost of sewer lines which he estimated at $7,759,000. His estimate did not include the cost of acquiring water and sewer district physical assets and value as a going business, nor the cost of acquiring electric utility assets in the PAA.
Columbus is in excellent financial condition, but there is a limit to its ability to borrow for capital purposes. The Court is of the opinion the City should have provided it with reliable estimates of the total cost to the City of the annexation in order to meet the burden of showing reasonableness. Otherwise, the Court has no way of knowing if the City can finance the proposed capital improvements within the entire PAA.
.....
However, when it comes to the matter of proving reasonableness of a proposed annexation, the burden is on the municipality to offer evidence to meet that burden.
It should first be noted under this point that the City qualified its promise with respect to a wide variety of capital intensive services. Specifically, these services were promised only where they are "necessary and economically feasible." The use of such equivocal language in an annexation ordinance is not per se unreasonable. See Ritchie v. City of Brookhaven, 217 Miss. 860, 65 So.2d 436 (1953). However, it does call into question the willingness of the City to follow through on the promises made in the legislation. When this uncertainty is combined with further evidence of lack of commitment, such as a general failure to estimate costs and plan for implementation of municipal services, as well as some indications of delayed past performance, then the reasonableness of the annexation can fairly be questioned. It is apparent that in cutting back the areas to be taken in by Columbus, the chancellor was seeking to limit the annexation to those areas where residents would actually be obtaining some increased services in exchange for their tax dollars. This is consistent with the reasonable equals equitable notion expressed in Western Line.
There was ample evidence to support the chancellor's observations that planning was minimal. Accordingly, the lower court's finding on this factor was not manifestly erroneous.

*1183 Conclusion

The lower court was unable to determine the reasonableness vel non, of the annex as originally proposed because the City failed to provide reliable cost estimates for provision of basic municipal services. Arguably, the failure of proof combined with the other evidence tending to show a lack of commitment on the City's part was sufficient grounds to deny any expansion. However, the chancellor used the information provided by the parties at trial to define areas where he felt implementation of municipal services was sufficiently likely to make annexation reasonable. Annexation was approved in developed areas where economic feasibility was unquestionable, areas of vacant land adjacent to developed areas, and areas where City water and sewer were already in place. The logic of the lower court's decision is sound. Accordingly, we conclude that this assignment of error is without merit and the judgment of the chancellor is affirmed.

II. THE CROSS-APPEAL

THE TRIAL COURT ERRED IN DECLARING A PORTION OF THE REQUESTED ANNEX UNREASONABLE.
The lower court found that the annexation of the entire area proposed by the City was unreasonable under a totality of circumstances after analyzing the appropriate indicia. The City argues on its cross-appeal that this finding was error. The City primarily relies on Miss. Code Ann. § 21-1-27 (1972) and cases relevant to its interpretation. Parker Gin Corp. v. Town of Drew, 214 Miss. 147, 58 So.2d 372 (1952); Ritchie v. City of Brookhaven, 217 Miss. 860, 65 So.2d 436 (1953). This section authorizes a city to state in general terms the, "proposed improvements to be made in the annexed territory, the manner and extent of such improvements, and the approximate time within which such improvements are to be made." The Ritchie case specifically upholds the "necessary and economically feasible" language employed by Columbus as sufficient under the statute.
The problem with the City's reasoning is that the chancellor did not hold the language in the ordinance to be legally insufficient. Instead, he applied the indicia of reasonableness adopted by this Court for evaluating proposed annexations and found the proposal unreasonable. There is a distinction. While a general statement of proposed improvements is sufficient in the ordinance that begins the annexation process, reliable cost estimates and assurances that promised services will be provided (i.e. plans for implementation) are necessary to establish reasonableness. Otherwise cities would be free to increase revenue by conscripting new areas without showing that they are willing to provide anything in return.
As discussed above, the City failed to provide the lower court with adequate evidence that residents of the entire PAA would receive anything of value in return for their municipal tax dollars. Thus, the City did not satisfy its burden of proof as to reasonableness. Accordingly, the lower court properly limited the annexation. On cross-appeal the judgment of the chancellor is affirmed.
AFFIRMED ON DIRECT AND CROSS-APPEAL.
HAWKINS, C.J., PRATHER, P.J., and BANKS, J., concur.
SULLIVAN, PITTMAN, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur in results only.
PITTMAN, J., specially concurs with separate written opinion joined by SULLIVAN, ROBERTS and SMITH, JJ.
McRAE, J., specially concurs with separate written opinion joined by BANKS, J.
PITTMAN, Justice, specially concurring:
While I agree with the result reached by the majority opinion, I propose that in the future the Court should closely follow the statutory scheme of annexation given to us by the legislature. "Annexation is a legislative affair. The judicial function is limited to the question whether the annexation is reasonable." Matter of Boundaries of City of Jackson, 551 So.2d 861, 863 (Miss. 1989). According to the current status of our law,

*1184 [t]he outcome determinative question of ultimate fact before the Chancery Court is the reasonableness of the proposed annexation. Over the years our case law has developed a number of factors that ought be considered in this context. Before listing them, we emphasize that these factors are but indicia of reasonableness and not separate or distinct tests in and of themselves. Bassett v. Town of Taylorsville, 542 So.2d 918, 921 (Miss. 1989).
In a series of cases beginning with Dodd v. City of Jackson, 238 Miss. 372, 396-97, 118 So.2d 319, 330 (1960) down through most recently McElhaney v. City of Horn Lake, 501 So.2d 401, 403-04 (Miss. 1987) and City of Greenville v. Farmers, Inc., 513 So.2d 932, 941 (Miss. 1987), we have recognized at least eight indicia of reasonableness. These include (1) the municipality's need for expansion, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) the potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) the need for zoning and overall planning in the area, (6) the need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, and (8) the past performance and time element involved in the city's provision of services to its present residents.
Other judicially recognized indicia of reasonableness include (9) the impact (economic or otherwise) of the annexation upon those who live in or own property in the area proposed for annexation, Western Line, 465 So.2d at 1059; (10) the impact of the annexation upon the voting strength of protected minority groups, Enlargement of Boundaries of Yazoo City, 452 So.2d at 842-43; (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and for the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the (economic and social) benefits of proximity to the municipality without paying their fair share of taxes, Texas Gas Transmission Corp. v. City of Greenville, 242 So.2d 686, 689 (Miss. 1971); Forbes v. Mayor & Board of Aldermen of City of Meridian, 86 Miss. 243, 38 So. 676 (1905); and (12) any other factors that may suggest reasonableness vel non. Bassett v. Town of Taylorsville, 542 So.2d 918, 921 (Miss. 1989).
In the end, the Chancery Court is charged to determine whether under the totality of the circumstances the annexation (or any part thereof) is reasonable, having due deference to the interests of the municipality and, as well, the interests of the parties affected. City of Greenville v. Farmers, Inc., 513 So.2d at 941-42.
City of Jackson, 551 So.2d at 864.
The progression of our law on annexation and the corresponding use of the indicia of reasonableness has not occurred without protest. "[T]he proliferation of `indicia of reasonableness,' ... can only lead one to the conclusion, that `indicia of reasonableness' are either now devoid of substance or so malleable as to be meaningless." City of Jackson, 551 So.2d at 878 (Blass, J., dissenting); "`Reasonable' is now determined by the length of the chancellor's nose, or foot, if you prefer." Matter of Boundaries of City of Vicksburg, 560 So.2d 713, 716 (Miss. 1990) (Sullivan, J., dissenting); "Numerous recent decisions convincingly indicate that the test has been expanded so far that now it is absolutely meaningless." In the Matter of the Enlargement of the Corporate Limits and Boundaries of the City of Gulfport, 627 So.2d 292, 294-95 (Miss. 1993) (Smith, J., dissenting). The result of our case law is that this Court can now do little but affirm a chancellor's annexation decision. The indicia of reasonableness, by themselves, provide an insufficient review of the process of annexation.
A better means of accomplishing the balancing of equity, fairness, and determination of what is reasonable in the annexation process was suggested in Justice Sullivan's dissent in Matter of Boundaries of City of Vicksburg, 560 So.2d at 717:

*1185 I propose that a municipality, in order to go forward with any annexation, must first show by a preponderance of evidence, that it now adequately provides all municipal services to all areas already within municipal limits. If, in a bifurcated trial, the municipality meets this requirement, the city may then proceed to show why annexation is necessary, and exactly what, when and how it will provide services to the area to be annexed.
If this is accomplished, annexation may be granted but the chancellor's judgment must set out a time table for the city to accomplish what it claims it can for the newly annexed area. If, at the end of the period set out in the judgment the protestors can show by a preponderance of the evidence that the city has not provided the promised services, then the chancellor must set the annexation aside.
The suggestion of Justice Sullivan began to approach the idea that the Legislature, through its enactments, more fully dealt with the question of annexation than the Court before realized or acknowledged.
While the judicially established "indicia" seemed to be a good way to measure the need for annexation and the reasonableness of annexation, this Court has so extended the consideration of "indicia" and the discussion of the indicia to the point that it has become exclusive of other considerations in its application and as stated above, by dissent, often meaningless. It is "unreasonable" for this Court to continue to impose a judicial scheme in the area of annexation while holding annexation is a legislative affair.
While we have written that the question of annexation is legislative and should be dealt with in the legislative forum, we have continuously, through judicial pronouncements, attempted to improve on the statute and we have concluded that the statute failed in its completeness. We have acted as though the Legislature did not act and we created a judicial plan that now is insufficient. We have reached an impasse so that this Court is boxed so that all we can do is affirm the chancellor's findings.
Most of the objections made to the judicial scheme of determining annexation are based on the fact that individual objectors are placed at a tremendous disadvantage to the municipality seeking to annex property of persons not wanting to be annexed. We should not ignore benefits obtained by using the court established indicia; however, we should also recognize that the indicia, created and implemented through court decisions, speak only to the needs of the municipality. The Legislature's scheme gives a more complete consideration to concerns not only of the municipality but the concerns and the rights of the objectors. In the future, the statutory scheme should be adhered to fully when dealing with annexation.
The indicia of reasonableness place too much emphasis on the effects of annexation on the annexing municipality and little emphasis on those about to be annexed. Those seeking to fight city hall have had to do so without any weapons. While the court established indicia are not to be ignored, our primary guideline in this area must be Miss. Code Ann. § 21-1-27 through -41 and § 21-1-45 through -47 (1990), where the Legislature dealt with both the needs of the municipality and the concerns of those in the area to be annexed.
Miss. Code Ann. § 21-1-27 provides:
The limits and boundaries of existing cities, towns and villages shall remain as now established until altered in the manner hereinafter provided. When any municipality shall desire to enlarge or contract the boundaries thereof by adding thereto adjacent unincorporated territory or excluding therefrom any part of the incorporated territory of such municipality, the governing authorities of such municipality shall pass an ordinance defining with certainty the territory proposed to be included in or excluded from the corporate limits, and also defining the entire boundary as changed. In the event the municipality desires to enlarge such boundaries, such ordinance shall in general terms describe the proposed improvements to be made in the annexed territory, the manner and extent of such improvements, and the approximate time within which such improvements are to be *1186 made; such ordinance shall also contain a statement of the municipal or public services which such municipality proposes to render in such annexed territory. In the event the municipality shall desire to contract its boundaries, such ordinance shall contain a statement of the reasons for such contraction and a statement showing whereby the public convenience and necessity would be served thereby.
(Emphasis added). Section 21-1-27 requires the municipality to specifically announce and describe how, when, where and why the municipality proposes to annex new territory. The municipality must know, before it decides to annex, the services it plans to render and how it proposes to implement these services. The city should be able to list specific services that it intends to provide immediately. It must be the intent of the municipality to fully and quickly weave the area to be annexed into the fabric of the municipality. The services rendered to the area to be annexed must very soon be equivalent to the services already available to the citizens of the municipality. If the municipality has failed in large measure to provide adequate services to citizens already within the municipality boundaries and has great needs unsatisfied within its boundaries, then why would a court find that they are going to deliver full services timely to newly annexed areas? When considering a plan of annexation, it is appropriate for the court to inquire into the present state of development of services within the municipality as it exists prior to annexation.
In passing the ordinance of annexation pursuant to § 21-1-27, the municipality must affirmatively find the need for expansion and adopt a plan of development of services. The municipality and the chancery court may use the indicia as guidelines for determining the overall reasonableness of the plan. However, as stated by this Court, no single indicium will control the reasonableness of the annexation plan, but each may be looked at in the totality of the circumstances. City of Jackson, 551 So.2d at 864.
The next part of the annexation procedure may be found in § 21-1-29, which states:
When any such ordinance shall be passed by the municipal authorities, such municipal authorities shall file a petition in the chancery court of the county in which such municipality is located; however, when a municipality wishes to annex or extend its boundaries across and into an adjoining county such municipal authorities shall file a petition in the chancery court of the county in which such territory is located. The petition shall recite the fact of the adoption of such ordinance and shall pray that the enlargement or contraction of the municipal boundaries, as the case may be, shall be ratified, approved and confirmed by the court. There shall be attached to such petition, as exhibits thereto, a certified copy of the ordinance adopted by the municipal authorities and a map or plat of the municipal boundaries as they will exist in event such enlargement or contraction becomes effective.
Often it will not be feasible or possible for a municipality to complete improvements immediately and the development of substantial municipal services must be done over time. The statutory scheme presupposes that the municipality will have a realistic timetable for the provision of services.
In Ferguson v. Town of Vaiden, 242 So.2d 124, 126 (Miss. 1970), this Court found that a city filing a petition requesting confirmation of an annexation ordinance had "obligated itself to make the improvements and furnish the services set out in the ordinance... ." This obligation of the municipality extends to the annexed area. The reviewing court has the obligation to make sure the city has the ability to complete the plan. The annexed area gives up a measure of independence through this process, therefore, what it gets in return must be spelled out and delivered.
The hearing on the petition for annexation is provided for in Miss. Code Ann. § 21-1-33:
If the chancellor finds from the evidence presented at such hearing that the proposed enlargement or contraction is reasonable and is required by the public convenience and necessity and, in the event of an enlargement of the municipality, that reasonable public and municipal services will be rendered in the *1187 annexed territory within a reasonable time, the chancellor shall enter a decree approving, ratifying and confirming the proposed enlargement or contraction, and describing the boundaries of the municipality as altered. In so doing the chancellor shall have the right and the power to modify the proposed enlargement or contraction by decreasing the territory to be included in or excluded from such municipality, as the case may be. If the chancellor shall find from the evidence that the proposed enlargement or contraction, as the case may be, is unreasonable and is not required by the public convenience and necessity, then he shall enter a decree denying such enlargement or contraction. In any event, the decree of the chancellor shall become effective after the passage of ten days from the date thereof or, in event an appeal is taken therefrom, within ten days from the final determination of such appeal. In any proceeding under this section the burden shall be upon the municipal authorities to show that the proposed enlargement of contraction is reasonable.
(Emphasis added).
The finding of "public convenience and necessity" is for the municipality's governing board to determine. Bassett v. Town of Taylorsville, 542 So.2d 918, 920 (Miss. 1989). The remainder of § 21-1-33 provides that the chancellor and this Court shall review to determine that the plan is reasonable. The Court should review to assure that reasonable public and municipal services will be rendered in the annexed territory in a reasonable time, i.e., that the municipality has shown that it will be able to follow through with its promises and that the methods or means of payment is reasonable. These standards apply to both the municipality and the area to be annexed. That is, the plan must be reasonable for the annexed area as well as the municipality. The burden of proof on this showing lies in its entirety with the municipality.
It may appear to some that nothing separates this opinion from others written by this Court. However, the purpose of this opinion is to emphasize that the indicia are secondary to the statutory scheme developed by the legislature. While this Court has developed new indicia of reasonableness, we have not looked at the entire legislative scheme. Deannexation completes the statutory scheme. Deannexation has been deemphasized to the detriment of the people who are to be or have been annexed. This opinion is written in part to recognize, and to emphasize deannexation where it is necessary to the protection of the areas annexed by the municipalities. It is the only protection that the area to be annexed or the people to be annexed have and the Court is their only forum.
The completion of the statutory scheme may be found in §§ 21-1-45 and -47 with the process of deannexation:
The qualified electors of any territory contiguous to and adjoining any existing municipality and the qualified electors of any territory which is a part of an existing municipality, may be included in or excluded from such municipality, as the case may be, in the manner hereinafter provided. Whenever the inhabitants of any incorporated territory adjacent to any municipality shall desire to be included therein, and whenever the inhabitants of any territory which is a part of an existing municipality shall desire to be excluded therefrom, they shall prepare a petition and file same in the chancery court of the county in which such municipality is located, which said petition shall be signed by at least two-thirds of the qualified electors residing in the territory proposed to be included in or excluded from such municipality. Said petition shall describe accurately the metes and bounds of the territory proposed to be included in or excluded from such municipality, shall set forth the reasons why the public convenience and necessity would be served by such territory being included in or excluded from such municipality, as the case may be, and shall be sworn to by one or more of the petitioners. In all cases, there shall be attached to such petition a plat of the municipal boundaries as same will exist in the event the territory in question is included in or excluded from such municipality. No territory may be so *1188 excluded from a municipality within two years from the time that such territory was incorporated into such municipality, and no territory may be so excluded if it would wholly separate any territory not so excluded from the remainder of the municipality. No petition for the inclusion or exclusion of any territory under this section shall be filed within two years from the date of any adverse determination of any proceedings originated hereinafter under this chapter for the inclusion or exclusion of the same territory.
The deannexation process is set out in detail in § 21-1-47, which adopts many of the procedures of the annexation process. The deannexation process should serve as a reminder to the municipality that even if annexation is approved, the responsibility to provide the promised services is a serious one. Proposals made in the annexation petition must soon become services rendered. Deannexation also serves as an avenue of equitable and fair treatment for those living in the annexed area, with the possibility of withdrawal from the municipality a reality where promised services are not provided. Annexation and deannexation should be viewed by the chancery courts on an equal basis. Although the court may grant annexation when a city petitions it with a reasonable plan, the court must be just as quick to grant deannexation when the city does not deliver on services promised in the plan. Recognition of this completed legislative scheme gives to the area to be annexed equity and fairness through a completed mosaic of law.
Although this Court has long stated that annexation is a legislative process, we have developed our own rules of annexation. As stated earlier, the statutory scheme is sufficiently complete and the court must not impose a judicial remedy.
SULLIVAN, JAMES L. ROBERTS, Jr. and SMITH, JJ., join this opinion.
McRAE, Justice, concurring:
I concur only with the results of today's decision and write separately to suggest that the time has come to acknowledge that the courts should take a back seat to the legislature in annexation cases. Indeed, we have recognized that "[a]nnexation is a legislative affair, the judicial function is a matter of whether the annexation is reasonable." Matter of Extension of the Boundaries of the City of Jackson, 551 So.2d 861, 863 (Miss. 1989). Nevertheless, we continue to take annexation matters out of the legislature and put them into the hands of the courts. As Justice Smith has explained, "[t]he historical changes since 1890 concerning annexation cases are primarily the results of politics, simply `passing the buck,' or more probably, a `hot potato,' bounced around from the legislature, to the Circuit Court, then to the Chancery Court." Matter of the Enlargement of the Corporate Limits and Boundaries of the City of Gulfport, 627 So.2d 292, 262 (Miss. 1993) (Smith, J., dissenting). The time has come to give "it" back to the legislature.
Ostensibly courts are charged with determining whether a proposed annexation is "reasonable." City of Jackson, 551 So.2d at 864. Toward this end, we have devised ever-expanding "indicia of reasonableness," subjective criteria "either now devoid of substance or so malleable as to be meaningless." City of Jackson, 551 So.2d at 878 (Blass, J., dissenting). A city can promise the moon and introduce evidence of its plans and intents which fully comport with the eleven indicia of reasonableness. However, these guidelines provide no recourse when, several years later, the city has not taken a single step or made only token gestures toward fulfilling the promises made during annexation proceedings. While the city's past performance in providing services and otherwise meeting its promises to newly-annexed areas is a factor to be considered by the chancellor, scrutiny of the city's track record avails those who have been slighted nothing, not even due process, and provides neither solace nor guaranty to those whose land may now be annexed.
Each party may be selective in the evidence it presents and the indicia of reasonableness it chooses to emphasize. The chancellor, too, may pick and choose without crossing the line of manifest error. As one member of this Court has observed, "`[r]easonable' *1189 is now determined by the length of the chancellor's nose, or foot, if you prefer." Matter of the Extension of the Boundaries of the City of Vicksburg, 560 So.2d 713, 716 (Miss. 1990) (Sullivan, J., dissenting). Thus, the outcome of an annexation case could well be just a reflection of the chancellor's philosophy about the direction the town's development should or should not take.
What is "reasonable" today may not be reasonable tomorrow. In Matter of the Enlargement of the Corporate Limits of Hattiesburg, 588 So.2d 814 (Miss. 1991), we affirmed the chancellor's finding that an interstate created a man-made barrier to annexation. Id. at 825. In 1989, when the chancellor entered his opinion in that case, great emphasis was placed on Interstate 59, which was perceived as limiting the city's expansion to the west. Five years later, that "barrier" no longer exists. Four-lane overpasses now cross the interstate, moving traffic without impediment. Still more are planned. Apparently, evidence of proposed road development was not presented during the annexation proceedings. However, since we are bound to apply the manifest error rule, the same results would have been achieved even if the chancellor had exercised his discretion by "writing around" any evidence contrary to his annexation sentiments.
Annexation cases are costly both to the city and the opponents to expansion. Through the legislative process, they could handled more economically and expeditiously. Unless judicial review is necessary to resolve some constitutional dilemma, it is time we bounced the annexation "ball" back into the legislature's "court." Accordingly, we should, once and for all, announce that annexation cases are legislative matters. Failing in that, I concur only in the results of the majority opinion.
BANKS, J., joins this opinion.