650 So.2d 490 (1995)
In the Matter of the ENLARGEMENT AND EXTENSION OF THE MUNICIPAL BOUNDARIES OF the CITY OF MADISON, Mississippi: The City of Jackson, Mississippi
v.
CITY OF MADISON.
No. 92-CA-00298-SCT.
Supreme Court of Mississippi, En Banc.
February 9, 1995.
*493 Douglas J. Gunn, Watkins & Eager, James L. Carroll, Mitchell McNutt Threadgill Smith & Sams, Jackson, for appellant.
John Hedglin, Stephen W. Rimmer, Rimmer Rawlings MacInnis & Hedglin, Jackson, for appellee.
En Banc.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION AND PROCEDURAL HISTORY
The City of Madison (Madison) sought to enlarge its existing corporate boundaries from 10.62 square miles to a total area of 20.20 square miles. Madison enacted an ordinance of annexation on December 5, 1989, and filed its petition of annexation on January 12, 1990. The City of Jackson (Jackson) did not file an objection until February 20, 1991.[1] Following recusals of both Madison County chancellors, this Court appointed Chancellor David Clark special chancellor.
Upon conclusion of Madison's case-in-chief, Jackson moved to exclude all evidence offered and to enter a judgment denying the proposed annexation. The chancellor granted Jackson's motion in part, eliminating from further consideration 4,454 acres of the area Madison sought to annex.[2] Following Jackson's evidence, the court found that annexation of all of the remaining area was reasonable and should be approved.[3] This area includes a large tract of land directly west of Madison and due north of Jackson (Tract 1) and three smaller parcels north and northeast of Madison (Tracts 2, 3, and 4). The City of Jackson subsequently perfected an appeal to this Court, seeking review of the following issues:
A. Whether Madison failed to meet its burden of proof on six of the most crucial indicia of reasonableness, thereby mandating reversal as a matter of law;

B. Whether the determination that the annexation is reasonable is grounded *494 on erroneous legal conclusions that six of the indicia of reasonableness were met, when neither the evidence nor the court's findings of fact support those conclusions; and

C. Whether the court failed to correctly apply the "clearly mandated by law" standard to Madison's annexation, especially as regards Tract 1, which is directly in Jackson's northern path of growth.

II. THE LAW

A. Whether Madison failed to meet its burden of proof on six of the most crucial indicia of reasonableness, thereby mandating reversal as a matter of law.
While "[a]nnexation is a legislative affair," confirmation of annexations is in the province of the chancery court. Matter of the Boundaries of City of Jackson, 551 So.2d 861, 863 (Miss. 1989); Miss. Code Ann. § 21-1-33 (1972). The role of the judiciary in annexations is limited to one question: whether the annexation is reasonable. City of Jackson, 551 So.2d at 863. Courts are "guided" in this determination of reasonableness by twelve factors previously set forth by this Court. This Court recently reaffirmed these twelve "indicia of reasonableness," but held "that municipalities must demonstrate through plans and otherwise, that residents of annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness." In the Matter of the Extension of the Boundaries of the City of Columbus, 644 So.2d 1168, 1172 (Miss. 1994).
The twelve indicia of reasonableness are: (1) the municipality's need to expand, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) need for zoning and overall planning in the area, (6) need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, (8) past performance and time element involved in the city's provision of services to its present residents, (9) economic or other impact of the annexation upon those who live in or own property in the proposed annexation area, (10) impact of the annexation upon the voting strength of protected minority groups, (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and in the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy economic and social benefits of the municipality without paying their fair share of taxes, and (12) any other factors that may suggest reasonableness. See Matter of Boundaries of City of Jackson, 551 So.2d 861, 864 (Miss. 1989).
These twelve factors are not separate, independent tests which are conclusive as to reasonableness. Western Line Consol. School Dist. v. City of Greenville, 465 So.2d 1057, 1059 (Miss. 1985). Rather, these factors are "mere indicia of reasonableness." "[T]he ultimate determination must be whether the annexation is reasonable under the totality of the circumstances." City of Columbus, 644 So.2d at 1172 (citing Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d 814, 819 (Miss. 1991); Matter of Boundaries of City of Vicksburg, 560 So.2d 713, 716 (Miss. 1990); In re Enlargement of Corporate Boundaries of the City of Booneville, Prentiss County, Mississippi, 551 So.2d 890, 892 (Miss. 1989); In the Matter of the Extension of the Boundaries of the City of Jackson, Mississippi, 551 So.2d 861, 864 (Miss. 1989); Bassett v. Town of Taylorsville, 542 So.2d 918, 921-22 (Miss. 1989)). An annexation is reasonable only if it is fair. Western Line, 465 So.2d at 1060. In making this determination, the annexation must be viewed "from the perspective of both the city and the landowner[s]" of the proposed annexation area. Id. at 1059-60.
With the foregoing in mind, it is clear that Jackson's contention  that a failure of proof on six of the twelve factors mandates reversal as a matter of law  is erroneous. The chancellor was required to determine *495 reasonableness under the totality of the circumstances, employing the applicable indicia of reasonableness merely as an aid to this determination. Restated, it is for the chancellor to determine whether the annexation is fair and reasonable and whether Madison carried its burden of showing reasonableness by demonstrating that residents of annexed areas will receive something of value in exchange for their tax dollars. City of Columbus, 644 So.2d at 1172.
The chancellor in the case sub judice was clearly aware of his duty and the role of the judiciary in annexation cases. At the close of Madison's case-in-chief, when Jackson moved to exclude all evidence presented and for a judgment in Jackson's favor, the chancellor stated on the record that the petitioning city has the burden of establishing the reasonableness of the proposed annexation. He then discussed each of the indicia of reasonableness, noting that they are not separate or distinct tests in and of themselves, and proceeded to analyze the evidence which had been presented on each factor.
As the chancellor employed the correct legal standards, this Court's standard of review is limited. Reversal of the chancellor's findings regarding reasonableness of the annexation is warranted only if the chancellor is manifestly wrong and his findings are not supported by substantial credible evidence. Matter of Confirmation of Alteration of Boundaries of City of Horn Lake, Miss. and the City of Southaven, Miss., 630 So.2d 10, 16 (Miss. 1993) (citing Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d 814, 819 (Miss. 1991)). Even where the credible evidence is conflicting, this Court will not reverse unless the chancellor's findings are manifestly wrong. Hattiesburg, 588 So.2d at 819.
Jackson contends that the chancellor's findings of fact are correct, but his legal conclusion, that the annexation is reasonable, is incorrect. An examination of the twelve factors aids this Court's review.

1. Need to Expand

a. The Parties' Contentions
Jackson contends that Madison failed to present evidence establishing its need to expand as to all of the annexation area; therefore, the chancellor's approval of the annexation as reasonable should be reversed and rendered as a matter of law. Madison responds that in addition to its imminent need for vacant land suitable for development, it has a need to expand in order to make decisions and funding commitments for the infrastructure which will be necessary to support the rapid growth of the city and to manage the city's growth in a logical manner to prevent the future need for expensive remedial measures. Jackson denies that the need for growth management alone bears heavily on the need to expand, but may be one of several reasons supporting the need for expansion. However, Jackson contends growth management would more appropriately be considered in conjunction with zoning and planning. Jackson also claims that this annexation was prompted not by Madison's need to expand, but by a desire to stop further northern movement by Jackson after the City of Jackson v. City of Ridgeland case was handed down by this Court. Jackson also claims that a 1988 Joint Resolution between Madison and Ridgeland provides that neither city will oppose the other's annexations, but together they will "carve up" the area north of Jackson between themselves.

b. The Chancellor's Findings
At the close of Madison's case-in-chief, the chancellor had the following to say about this factor:
When the evidence is considered, the court is of the opinion that it cannot conclude, based upon the evidence presented by the City of Madison, that the city has a need to expand at this time to the extent indicated by its proposed annexation, except as will be noted later. In the opinion of the court, there lies within the present boundaries of the City of Madison, and within the adjacent areas to be discussed by the court, adequate vacant developable land to meet the city's reasonable needs for the foreseeable future; however, as noted by the case law, this is but one of the indicia.
*496 At the close of all evidence, the chancellor made the following remarks regarding Madison's need to expand:
Suffice it to say that the City of Madison does not, in the opinion of this court, having considered the totality of the evidence, have a need to expand insofar as that need is for additional property for development. The City of Madison has sufficient property for development; however, the City of Madison has a need to expand for different reasons, which will be discussed hereinafter. I might add that this need for expansion would apply to all four designated tracts.

c. Supporting Evidence
Regarding the Joint Resolution between Madison and Ridgeland, Madison's Mayor Hawkins testified that the two cities established a line that Ridgeland agreed not to extend north of and Madison agreed not to cross in the southern direction. That line was roughly Lake Castle Road. Mayor Hawkins admitted that Jackson's potential growth to the north would be devastating to Madison.
At the time of trial, more than fifty-eight percent (58.69%) of Madison was classified as undeveloped and slightly more than fifty percent (50%) of the city was considered vacant, developable land, i.e., land not located in floodways, wetlands, or water. This amounts to 2451.98 acres of vacant developable land, according to Madison's expert, Joe Lusteck. Based on the rate of land utilization over the past ten years, Lusteck claimed Madison was developing at a rate of 182.7 acres annually, which translated to 13.4 years before Madison would be completely built out and eight to nine (8-9) years before Madison would be 75% built out, excluding land located in flood plains[4]. A build-out of 75-80% is a realistic rate for a city to achieve. Several large, vacant, developable tracts within Madison's existing corporate limits are less likely to be developed because of family farming operations, sixteenth section restrictions, families holding the land, and long term lease commitments.[5] W.F. Dearman, Jr. testified that development of residential subdivisions on sixteenth section land was acceptable to mortgage companies as a result of the Reservoir development.
Lusteck admitted that he had previously consistently testified that cities should be considering annexation when they are 66 2/3% built-out and actively pursuing annexation when they are 75% built out. However, Lusteck testified that Madison had a need to expand in order to manage its rapid growth. Corinne Fox, an expert witness for Jackson in the field of planning, stated that a city should not be required to develop all property within its boundaries before seeking to annex additional land, but claimed Madison had no need to expand.
Madison claimed a need to expand for growth management purposes. Much evidence was presented of development in the proposed annexation area already underway or complete at trial. Jackson's expert in the field of engineering, Ted Somers, testified that annexation prior to development is preferable, so that urban land use controls can be implemented before problems arise. Jim Elliott, a registered professional engineer who was accepted as an expert witness, was of the opinion that Madison had no need for expansion. Elliott's testimony regarding rate of land absorption and build-out time differed from Lusteck's.

d. Conclusion
The testimony of both cities' experts, with the exception of Elliott, reveals Madison's need to expand. Given the substantial credible evidence presented and the applicable manifest error standard, the chancellor cannot be found manifestly wrong in his determination that Madison has a need to expand.

2. Path of Growth

a. The Parties' Contentions
Jackson contends that Madison failed to present evidence that its path of growth included *497 Tract 1, due north of Jackson; therefore, the chancellor's approval of the annexation as reasonable should be reversed and rendered as a matter of law. Madison counters that although growth to its west has not kept pace with that to the east and north of the city, there is growth in that direction nonetheless. Moreover, the proposed annexation area is directly contiguous to Madison and Madison's growth overlaps into the proposed annexation area.

b. The Chancellor's Finding
At the close of all evidence, the chancellor found the following:
Looking at Tracts 2, 3 and 4, these tracts are a part of Madison's growth. Everyone who has testified seems to agree that the City of Madison is growing north and east. I don't think anyone contested that issue. Tract 3 and Tract 2 in particular are merely extensions of subdivisions that presently exist within the corporate boundaries, and Tract 4 to a large extent is an extension of the eastern portion of Madison; and therefore, those three tracts would certainly be within the path of growth of the city.
To the west, it cannot be seriously questioned that the rate of growth between the western boundary and the center of town has not been equivalent to the growth on the eastern side of town. On the western side, we have Tract 2, which is D'Evereaux. We have the new high school that's been built in Tract 1. We have water lines that have been extended to Lake Castle. It's very probable that Lake Castle is not situated where it is because of Madison, as has been argued. But the point is that although Lake Castle has not grown to Madison, Madison has grown to Lake Castle. We have a new parkway coming through and we have the Madison Hills development. We have water lines and sewer lines in the area which, in the opinion of the court, could be defined as activity which, in the opinion of the court, is equal to growth and development and therefore places Tract 1 in the path of growth of the City of Madison. Could very well be described as leapfrog growth, as some people have discussed it. Maybe a portion of the city has been leaped over; but if it is, it is. And how you got there is really not the issue.

c. Supporting Evidence
Lusteck testified that Madison's path of growth extended into the proposed annexation area. Corinne Fox disagreed.
Madison's path of growth toward the west, Tract 1, was evidenced by: construction of the new county high school, which is serviced by Madison for sewer and water; construction of the new parkway just west of the existing city; construction of St. Catherine's Village retirement complex; a water line to St. Catherine's Village; water and sewer lines to Lake Castle subdivision; and J. Army Brown's intent to develop the parcel of land he owned in Tract 1, which proposed development is referred to as Madison Hills.
Even Jackson's planning expert admitted that Madison had experienced substantial development in the western portion of the proposed annexation area, although with the exception of the Summertree Development, the western portion of Madison was vacant and undeveloped at the time of trial.
Regarding Madison's path of growth in the Madison Hills area, the westernmost area of Tract 1, no development had begun at the time of trial. Sale of these lots was at least a year and a half away at the time of the trial, assuming financing could be secured for the project. Madison's water and sewer lines which extend into Tract 1 reach the new high school and Lake Castle subdivision. Although the city was under no obligation to provide sewer or water to the school site, it did so at no cost to the school board.
Regarding Tracts 2, 3, and 4, Jackson does not contend that the chancellor erred in finding them in the path of Madison's growth.

d. Conclusion
The evidence set out above constitutes substantial credible evidence supporting the chancellor's finding. Consequently, the chancellor did not manifestly err in finding that this factor favors reasonableness.

*498 3. Natural Barriers

Jackson makes no claim that Madison failed in its proof on this factor. In fact, the evidence shows there are no natural barriers between the City of Madison and any portion of the proposed annexation area, which is what the chancellor found. Accordingly, this Court deems this factor satisfied and weighing in favor of reasonableness for purposes of this appeal.

4. Potential Health Hazards

a. The Parties' Contentions
Jackson contends that Madison failed to present evidence regarding potential health hazards and its intent to cure same as to all of the annexation area, therefore, the chancellor's approval of the annexation as reasonable should be reversed and rendered as a matter of law. Madison claims that there are no potential health hazards because Madison exercised the foresight to eliminate potential hazards via timely planning, design, and construction of sewers in the proposed annexation area.

b. The Chancellor's Finding
At the close of all evidence, the chancellor found the following:
We have an exhibit which shows sewer lines; and without digging that exhibit out, to the best of the court's memory we have sewer now provided in areas 2 and 3 and portions of area 4  or Tract 2 and 3 and Tract 4. Is that correct?
MR. HEDGLIN: Yes, sir.
THE COURT: We have in Tract 4 the presently existing use of septic tanks. The Supreme Court has said in the past that the presence and use of septic tanks is an indicia of possible health risk. We had one witness who testified  and I believe he was testifying concerning Tract 4  to seeing raw sewage in the street. That's the only witness, to the court's recollection, that so testified.
The other testimony is to the effect that although there are septic tanks in use in portions of the proposed annexation areas, that they do not present an immediate danger; and the court so finds that there is no immediate danger. Certainly the potential is there, and I don't think that can be argued with. The Supreme Court has taken the position that the use of septic tanks basically equals a potential for health hazards; however, in general the testimony has been to the effect that no health hazards presently exist in the proposed annexation area and none is expected in the foreseeable future. Were this the only factor that the court was considering, certainly this annexation's reasonableness would be questioned; but this is but one factor of many. Having considered all of the evidence, the court is of the opinion that the use of septic tanks in the annexation area suggests the reasonableness of this annexation.
Now, a comment needs to be made here... . But since that time [when petitioner rested] we've had additional testimony, particularly from the individual objectors, one of whom who has testified to raw sewage in the street, I believe in Tract 4. And then there was some testimony regarding the Lake Castle area and the potential there for seepage into the lake. And those things would be the basis of the court's decision at this point.

c. Supporting Evidence
Septic tanks were used in the western tract of the proposed annexation area in the case sub judice, yet Madison offered neither plans nor intention to extend sewer lines to these areas until economically feasible. The proposed annexation area around Lake Castle, annexation of which was found reasonable by the chancellor, had been certificated to Madison for three years prior to trial, yet Madison had no plans to provide sewer service to this area. According to Mayor Hawkins, the Lake Castle "problem" arose because that area was developed under county standards and annexed only after the fact. Corinne Fox stated that with the new interceptor in the Lake Castle area, Madison should have no problem providing sewer service. Fox further testified that the need for municipal sewer service would increase as these septic tanks aged. Fox testified that *499 Madison was prepared to provide such service, due to the interceptor already in place.
No septic tanks existed in any other portion of Tract 1. Madison did provide sewer service to other areas of the proposed annexation area. All of Madison's sewer was treated and disposed of by Jackson, which received a fee for this service.
L.C. Cheramie, a land developer and associate of J. Army Brown, knew of no hazards in the proposed annexation area. Other witnesses also were aware of no health hazards in the proposed annexation area, although the possibility of pollution of Lake Castle due to seepage was noted. Hugh Cottrell, an owner of land in the proposed annexation area, testified that he had observed septic sewer in the extreme northeast area of the proposed annexation area. Bud Alford, a consulting engineer, also testified that there were both current and potential health hazards in the proposed annexation area due to the use of septic tanks. Lusteck also testified that the proposed annexation area contained potential health hazards. Corinne Fox disagreed.

d. Conclusion
This Court has held that use of septic tanks in the proposed annexation area may indicate possible health risks. Matter of Boundaries of City of Jackson, 551 So.2d 861, 866 (Miss. 1989). Given the conflicting evidence as to the existence of potential health hazards and Madison's plan to implement solutions, the chancellor's finding on this factor is not manifestly erroneous.

5. Financial Ability to Provide Promised Services
Jackson does not argue this point on appeal. Consequently, Madison urges this Court to accept the chancellor's finding that the city of Madison could afford to provide the promised services. Predictably, Madison presented evidence that it could afford to make the improvements and furnish the services promised while Jackson presented evidence to the contrary. The promised services include sewer infrastructure, police protection, and fire protection. Again, given the credible conflicting evidence and the applicable standard of review, it cannot be said that the chancellor manifestly erred.

6. Zoning and Overall Planning

a. The Parties' Contentions
Jackson contends that Madison failed to present evidence regarding the need for zoning and planning in the proposed annexation area, particularly as to Tract 1, therefore the chancellor's approval of the annexation as reasonable should be reversed and rendered as a matter of law. Madison asserts that the best planning can occur when an area is annexed prior to being fully developed, in order to provide for future infrastructure and services, and that the only logical planner and provider for the proposed annexation area is Madison, as no other entity has the ability to provide for the proposed annexation area now or in the foreseeable future.

b. The Chancellor's Findings
Regarding zoning and overall planning, at the close of all evidence the chancellor found:
In Tracts 2 and 3, we have basically subdivisions that are outgrowths of subdivisions that currently exist within the present corporate limits of the City of Madison; and those outgrowing subdivisions have, in the opinion of the court, based upon the evidence, been substantially developed or developed substantially  whichever  pursuant to the ordinances of the City of Madison. In other words, to a large extent it already exists in those areas, and to a certain extent in Tract 4, particularly Oak Ridge.
There are other areas of Tract 4. I believe there is Kimwood and actually three others, I believe, the names of which escape me at the moment. But they are developing at this point, development already having begun and continuing, some of which meet some of the city's standards and some of which do not. There has been testimony from one individual objector, as I recall, concerning the need for traffic control in this area which might require some type of city planning. And if I remember correctly, that same witness testified that he had talked with county officials *500 and had been advised that the county could offer him no further assistance than what they had offered in the past, which he felt to be inadequate. Due to the existence of septic tanks in the area, eventually sewer service will be required which, of course, will require certain elements of planning.
The point has been made throughout the trial and also again reiterated during closing arguments that much can be said of the proposition that a city should do its planning on the front end  that is, to annex areas before it's too late. You have certain areas of Tract 4 and Tract 1 that would fit into that category, Tract 4 in particular. Tract 4 is so connected with the City of Madison, it is so located, that the possibility of it being connected with any other city is, to say the best, remote. In all probability, in fact and in actuality it will at some point in time be a part of the City of Madison and certainly will be in need of city planning and zoning.
Tract 1 presents a little different situation, and one element that the court cannot disregard, with respect to the western portion, is that the western portion is owned basically by two owners, both of whom are requesting this annexation. Strange as it may seem, they're requesting more government control. Madison is certainly a different community, different from the norm in this state; and there are those, obviously, who see that as a great advantage. But for whatever reasons, they are requesting that they be included in the annexation. With the completion of the parkway, with the building of the new school, this area will certainly see a great deal more traffic and inflow of population; and therefore there will be the need for some type of planning and zoning in the area.
The argument is made in the westernmost portion, the Madison Hills development, that there is no need for city controls out there as far as planning and zoning. That argument is two-fold. One is that the county provides similar-type services, and two, that if the property is developed by Mr. Brown and Mr. Cheramie, it will be top drawer and you need not worry about it. The problem the court has with those two arguments are, one, that Mr. Brown and Mr. Cheramie may well develop the entirety of that project; but the chances of that are slim to remote. Again, the property was not purchased with that intent.
Mr. Cheramie testified that the intent all along was to purchase the property, sell off parts of it for other development, and for he and Mr. Brown to develop the residential lots. It is possible that in selling the property Mr. Brown could do it in such a fashion as to require that any construction meet city standards. It is also possible that that would not be done. It is also possible that if you had enough money you could buy it today and put a racetrack out there. They bought it to sell. They bought it for a profit. That is the goal; that is the purpose. The property will develop. When you have that much money invested in it, it is not a religious experience.
Having considered the testimony in its totality, having personally viewed the area and reviewed the exhibits that have been introduced here in this courtroom, the court is of the opinion that when considering the needs of the four tracts for zoning and overall planning that could be offered by the City of Madison, that evidence suggests the reasonableness of the annexation.

c. Applicable Facts
Unlike the situation presented by most annexation cases, the proposed annexation area in the case at issue had the benefit of zoning, planning, a comprehensive plan, subdivision regulations, building and permit procedures and inspections, and other land use controls, courtesy of Madison County. Mayor Hawkins claimed the county zoning and building codes compared unfavorably to Madison's codes and enforcement.
Tract 1 consists of three basic areas: the Lake Castle area, Madison Central High School, and a 625 acre parcel owned by J. Army Brown. Although Brown's associate, L.C. Cheramie, testified that he and Brown planned top quality development, as the chancellor noted, this assurance may not be *501 adhered to by future owners.[6] Cheramie claimed the proposed annexation area needed city zoning and planning to provide for controlled growth and to maintain property values. Nonetheless, all infrastructure for the Madison Hills area had been planned to comply with city requirements and cost estimates were complete.
Madison, at the time of the trial, employed no professional planning staff and no zoning administrator. As of trial, Madison offered no planning or zoning services for the proposed annexation area which were not offered by Madison County, the Central Mississippi Planning and Development District, or the private consultants used by Madison County. Madison did have an official comprehensive plan in compliance with the law.
Hal Ellison, a member of Madison's planning committee, testified that the proposed annexation area needed the benefits provided by Madison's zoning, despite the zoning ordinance provided by Madison County, because Madison's zoning ordinance would preserve low density development and prevent incompatible land use. Lusteck testified that Madison's approach to planning and zoning provided more detail, control, and participation than that available through the Madison County program. There was also evidence presented that Madison offered better enforcement of its zoning ordinance than did the county.
W.F. Dearman, Jr., a civil engineer and land developer, testified that county zoning regulations and subdivision regulations were adequate. Corinne Fox agreed.

d. Conclusion
The projected need for municipal services in areas under development at the time of trial and for areas still in the planning stages of development at the time of trial will require planning in order to provide such services in a timely manner. It seems that the chancellor considered this, as well as all other evidence presented, in finding that this factor weighs in favor of reasonableness. Naturally, the evidence was conflicting; accordingly, the chancellor's finding cannot be disturbed.

7. Need for Municipal Services

a. The Parties' Contentions
Jackson argues briefly that Madison failed to provide sufficient proof on this factor. As Madison made no proposal to extend or construct any water or sewer lines, or to build any new roads in the proposed annexation area, Jackson argues that Madison has shown no intention of meeting whatever need there is for municipal services. Without any real argument or factual basis by Jackson regarding this factor, Madison argues that this Court should accept the chancellor's finding.

b. The Chancellor's Finding
Following the presentation of all evidence, the chancellor found:
Some places need them; some places don't. Those that don't already have them. What sewer service is provided in the area is provided by the city. The city provides water to Tract 1. The city provides fire protection already to all four tracts  on a voluntary basis, but they provide it. Traffic control will be needed in Tract 4, as has been testified to, and also in Tract 1, particularly around the school area.
Sewer service will be needed in Tract 4, certainly. The city at this time has not come into court saying, "We're going to provide this service by a certain date." What the city has said is that we will provide that service on an as-needed and feasible basis, which is really all that you can ask. After all, cities don't really pay for these services. The taxpayers do. Without the taxpayers, the cities have no money. That's where the money comes from. When it is feasible to do so, it should be done.

*502 As far as the need for municipal services in the four tracts, the court would also readopt its discussion concerning the need for zoning and planning, which certainly has application here. And having considered the evidence, the court is of the opinion that reasonableness is suggested.

c. Supporting Evidence
The proposed annexation area was served by a county-wide ambulance service; Madison's fire department and emergency medical technicians served the proposed annexation area. Madison County provided zoning and building codes for the proposed annexation area, although enforcement was not comparable to the City of Madison, according to Mayor Hawkins. Other services provided by the county were the court system, jails, county roads, drainage, and the library.
The city could provide guaranteed first level fire protection, additional police protection, overall planning for the area, and twice a week garbage pick up, all of which were, according to Mayor Hawkins, needed by residents of the proposed annexation area. Madison could also provide a quicker police response time to the proposed annexation area than could the county.
Regarding the Madison Hills area, ambulance service and garbage pick-up, provided by the county, would not change regardless of whether the annexation is approved. However, Cheramie testified that survival of the project depended heavily upon annexation because the development would need infrastructure such as water, sewer, electricity, and other city services. Without sewer service provided by Madison, Cheramie said the Madison Hills project would not be feasible until some other entity provided the service because the land densities wouldn't allow the use of septic tanks.
Corinne Fox testified that as the septic tanks in the Lake Castle area aged, the need for municipal level sewer service would increase. Fox allowed that Madison was prepared to provide such service, due to the new interceptor already in place. Fox also said D'Evereaux and Hunters Point III were in need of sanitary sewer service. Fox voiced the opinion that the area around the parkway and the new high school had a need for municipal level services. However, Fox's ultimate opinion was that the proposed annexation area was in need of no services that were not already being provided.
Development of the Madison Hills area on the far west would also require municipal sewer service, according to Fox. Ted Somers testified that the interceptor lines Madison had in place prior to trial, in the western portion of the annexation area, were sufficient to service the Madison Hills development. Somers further admitted that Jackson would not likely provide sewer service to this western portion of the proposed annexation area in the near future.[7] Instead, Somers believed the more logical course of action was for that area to be served through Madison's existing sewer system.
Residents of the proposed annexation area who testified differed in their opinions regarding the need for municipal services, as did the experts for Madison and Jackson.

d. Conclusion
The proposed annexation area at issue is not totally lacking in the services that can be provided by a municipality. Some residents of the proposed annexation area favored annexation in order to obtain municipal services while others opposed annexation, claiming no need of municipal services. As noted in City of Columbus, 644 So.2d at 1178, this factor deserves little consideration under these particular circumstances. Nonetheless, given this Court's standard of review and the conflicting testimony, this Court cannot find that the chancellor manifestly erred.

8. Past Performance
Jackson's only mention of this factor on appeal is contained in a footnote in its brief, which merely states that this factor was a contested issue at trial. With no argument *503 by Jackson that Madison failed to present sufficient evidence on this factor, Madison claims this Court should assume this factor was satisfied. The chancellor found that Madison's past performance indicated the reasonableness of this annexation. Although Madison's past performance was criticized by Jackson, the city of Madison presented evidence in the form of witness testimony that the past performance of its police and fire departments, city employees, zoning and administration, mosquito control, garbage pick up, street maintenance, sewer service, and small animal control had been excellent. Again, given the substantial credible yet conflicting evidence presented, and this Court's deferential standard of review, it cannot be said that the chancellor was manifestly in error.

9. Impact on Property Owners

a. The Parties' Contentions
Again, Jackson first implicitly agrees that this factor weighs in favor of reasonableness because no contrary argument is presented. Madison asks this Court to defer to the Chancellor's finding. In reply, Jackson urges that the interest of a landowner must defer to the good of the region and the central city which drives the region.

b. The Chancellor's Findings
At the close of all evidence, the chancellor found:
The major complaint voiced by the individual objectors is that they don't need or want what the city has to offer, and they don't want to pay the taxes... . The fact that one is required to pay taxes is not sufficient to prove unreasonableness, nor is it sufficient to rebut reasonableness.
Again, we also have the factor here of the western portion of Tract 1, which is basically owned by two landowners, Mr. Brown and the School District, and their request to be included in this annexation. And the bottom line on that is that this court finds it very difficult to say that an annexation is unreasonable, when the city asks for it and the landowner asks for it. Certainly I think the court would have the standing and the right to say that it's unreasonable, even under those circumstances. But in the context of this particular litigation, the fact that the landowners have requested to be included within the annexation adds further strength to the reasonableness of the annexation. And having considered the evidence, the court is of the opinion that the annexation proposed by the City of Madison would have no adverse impact, economic or otherwise, on the residents who reside in or upon those who own property situated in Tracts 1, 2, 3 and 4, with the possible exception of the increase in the taxes; and in the opinion of the court, that is not sufficient to rebut the reasonableness of the annexation.

c. Supporting Evidence
J. Army Brown, owner of the largest portion of Tract 1, was in favor of annexation. Owners of the portion of Hunters Point subdivision which was located in the proposed annexation area did not object to the annexation. Other owners of large portions of the proposed annexation area, David Cox, the Spains, and the Madison County School District, also interposed no objection to the annexation. The Madison County School Board was actually in favor of the annexation. The Lake Castle homeowners' association lodged no objection to the annexation.
Mayor Hawkins testified that the city tax millage rate would be offset by the savings gained through the fire rating of 7, via guaranteed fire protection by Madison, and may even prove a savings to residents of the proposed annexation area. Joe Lusteck also was of the opinion that the economic impact on property owners in the proposed annexation area would be favorable, although Corinne Fox disagreed. Jim Elliott testified that, regarding equity and fairness to the land owners, annexation of Tracts 2 and 3 was reasonable.
Hugh T. Cottrell, who owned two parcels of property located within the proposed annexation area, was in favor of annexation. Alva Rutledge, another owner of property in the proposed annexation area, favored annexation. Various individual objectors testified *504 that they opposed annexation of their property.

d. Conclusion
With substantial credible evidence supporting his finding on this factor, it cannot be said that the chancellor manifestly erred. The evidence presented indeed tends to establish reasonableness.

10. Dilution of Minority Voting Strength
Once again, Jackson makes no claim that Madison failed to present evidence regarding this factor. Madison asks this Court to deem this factor satisfied for purposes of this appeal. As the proposed annexation would clearly have a positive effect on minority voting strength, the chancellor was correct: this factor weighs in favor of reasonableness.

11. Benefits without Taxes

a. The Parties' Contentions
Jackson contends that Madison failed to present evidence that residents of Tract 1 within the proposed annexation area, due north of Jackson, were reaping the benefits provided by Madison without paying their fair share of taxes, therefore the chancellor's approval of the annexation as reasonable should be reversed and rendered as a matter of law. Madison cites the insurance rate benefit enjoyed by property owners in the proposed annexation area, as a result of Madison's voluntary fire protection service, as well as use of Madison infrastructure and institutions by residents of the proposed annexation area as evidence of benefits without taxes.

b. The Chancellor's Findings
Regarding this factor, after presentation of all evidence the chancellor said:
With regard to the eastern portion of Tract 1 and Tracts 2, 3 and 4, the residents of this area certainly use the city streets; and to the best of the court's recollection, there is no other access to Tract 3 other than the city streets, and possibly in Tract 2. I think there are some proposed alternative accesses; but at this time most of the access, in any event, is through city streets.
Certainly these residents, particularly those who testified, use businesses located within the city. They shop at the grocery store and the drug store. They take their clothes to the laundry. They take their children to schools located within the city and to day care centers. They attend church in the city and other events and activities. Certainly they each benefit from a reduction in their insurance rate on their homes. And I think it's a given that they're not paying any taxes right now to the city. I don't think anybody has contested that  which may be our only uncontested issue.
But in any event, certainly these citizens derive benefits from the close proximity to the City of Madison, and certainly they have done so without paying any taxes. And in the opinion of the court, if they're going to bring their dirty laundry into town, they ought to at least help pay for the streets. The evidence suggests the reasonableness of the annexation.

c. Supporting Evidence
In addition to the benefits enjoyed by residents of the proposed annexation area as summarized above by the chancellor, these residents also enjoyed the Madison Library, Madison Airport, and Strawberry Patch Park. Madison also boasted three facilities within its city limits devoted to the care of the elderly, all three of which served patients from both within and without the city of Madison. Residents of the proposed annexation area also frequented Madison's banks, hardware stores, dentists, and doctors.
One benefit enjoyed by some homeowner residents of the proposed annexation area, without the burden of a city tax, was lower fire insurance rates as a result of Madison's fire protection. The reduction of insurance rates would offset the projected increase in ad valorem taxes, at least as to single family residences.
Madison also provided primary emergency medical technician and rescue unit response for the entire proposed annexation area. *505 Madison provided sewer to all of the proposed annexation area that received such service. Madison also provided water service to all portions of the proposed annexation area which were not previously certificated to Bear Creek Water Association, Inc., which held the certificate on most of the proposed annexation area.

d. Conclusion
Given the substantial credible evidence, it cannot be said that the chancellor's finding regarding this factor is manifestly erroneous.

12. Other

a. The Parties' Contentions
Jackson claims that the adverse impact of the annexation on the city of Jackson is a factor which should have prevented annexation of any and all of the proposed annexation area. Madison contends that Jackson offered no credible proof that the annexation would significantly adversely affect Jackson.

b. The Chancellor's Findings
Following Madison's case-in-chief, the chancellor had this to say:
The owner of the proposed Madison Hills development, as well as the Madison County School Board regarding the new high school in the western annexation area, have requested that their properties be included in this annexation. Certainly that is a factor that should be considered by the court. Since these two areas can be annexed by the City of Madison with little if any impact upon the surrounding property owners, reasonableness sufficient to withstand defending motions would seem to be present.
Following presentation of all evidence, the chancellor stated that the Jackson case did not require summary dismissal of an action simply because the proposed annexation area is also within the path of growth of the City of Jackson. Instead, the chancellor found that this Court had intended that the "other" factor perhaps be given greater weight than the eleven other indicia of reasonableness. The chancellor concluded that if the proposed annexation area were immediately adjacent to the boundaries of the City of Jackson, or had Jackson expressed a real interest in annexing the proposed annexation area, the result might have been different, given the Jackson case. The chancellor found the annexation reasonable.

c. Supporting Evidence
Mayor Ditto testified that limitation of Jackson's paths of growth was the city's most serious long-term problem and if the proposed annexation were allowed, it would seriously adversely affect its ability to grow and develop. Annexation of Tract 1 alone would eliminate a 2 to 2 1/2 mile area along Jackson's northern boundary for future expansion. Ditto admitted that even if Madison's annexation were allowed, Jackson would have a northern growth corridor approximately eight miles wide. However, this corridor is to the northwest, without easy access to I-55, rather than along north and northeast Jackson, where substantial development has occurred. The land to Jackson's northwest was also less attractive for development because in a separate drainage basin. According to Ditto, Jackson planned to pursue annexation of the proposed annexation area at issue in the next three to five years.[8]
Although Jackson had approximately thirty square miles of vacant developable land within its corporate boundaries, it was attempting to annex an additional fifteen square miles of vacant developable land to the south of the city. Jackson's recently adopted future land use plan did not address the proposed annexation area. And as recently as 1985, when Jackson described its long term growth needs to the court, the proposed annexation area was not mentioned.[9] Even the Jackson City Council had *506 been split regarding opposition to this annexation. The two council members whose wards adjoined Madison County had voted not to oppose the annexation.
Connie Cooper, President of the American Planning Association, testified that irrevocable harm could result to Jackson if the proposed annexation were allowed, as a result of prohibiting Jackson's path of growth in this direction. Other witnesses concurred, regarding the detrimental impact on Jackson. According to Lusteck, allowance of the annexation would cause a loss of less than 5% of Jackson's available growth path. But the detriment to Jackson is measured more in the loss of future tax base than the lack of available land.

d. Conclusion
While the language in City of Jackson is strong, the chancellor's interpretation was correct. This Court understands Jackson's desire to have its city limits coterminous with its economic, social, and transportation structure. However, on these particular facts, to find that the "Jackson factor" prevents annexation of the proposed annexation area by the City of Madison would be to declare this a super-factor or an independent dispositive test, which we decline to do.[10] The chancellor did not manifestly err.

III. CONCLUSION
All of the twelve indicia of reasonableness weigh in favor of annexation. Nonetheless, pursuant to City of Columbus, 644 So.2d at 1171, 1183, Madison must provide sufficient evidence that residents of the proposed annexation area will receive some benefit in return for their tax dollars before the annexation may be found reasonable. Madison claims annexed property owners would receive, in exchange for the city tax millage, municipal level police patrol, emergency response protection, increased garbage pick-up, municipal level street maintenance, and other city services. Jackson counters that Madison had no plans, at the time of trial, to extend sewer service to any new portion of the proposed annexation area, to spend funds to provide new water service to the proposed annexation area, to build any new roads or streets within the next five years, or to locate any parks or recreation sites or facilities in the proposed annexation area.
Evidence was presented that one benefit to be received in exchange for city taxes is controlled growth. Also, various boards, commissions, and committees created by the city governing body in Madison, including a planning and zoning board, airport committee, sign review committee, and recycling committee, will be expanded and open to residents of the proposed annexation area if the annexation is approved. Madison has committed its Grand Gulf funds, in an initial amount of $300,000 and annually thereafter $70,000, for city parks and recreation, which will benefit city residents.
The reduction of fire insurance rates, thanks to Madison's classification, would offset the projected increase in ad valorem taxes, at least as to single family residences. If taken into the city, residents of the proposed annexation area would receive first level guaranteed fire protection rather than voluntary protection. Without annexation, a fire within the city would be given priority over a fire in the proposed annexation area. Madison also planned to build a new fire station within five years of this annexation, if the annexation is successful.
Again depending upon success of the annexation, according to Madison's Public Works Director Denson Robinson, Madison would immediately begin providing road maintenance and improvements, drainage maintenance, and streetlights. Also, sewer and water rates for residents within the city would be 50% less than that charged for residents outside the city who receive those services from Madison.
Residents of areas previously annexed by Madison testified that as a result of the annexation they received improved zoning *507 and administration, mosquito control, garbage pick up, and street maintenance.
This is sufficient evidence of a benefit to be received by the residents of the proposed annexation area in exchange for their city taxes. With a finding of reasonableness regarding each of the twelve factors and a showing of benefits to be gained in exchange for taxes, the chancellor's approval of the annexation was correct.

B. Whether the determination that the annexation is reasonable is grounded on erroneous legal conclusions that six of the indicia of reasonableness were met, when neither the evidence nor the court's findings of fact support those conclusions.
As discussed above, the evidence supports the chancellor's findings of reasonableness as to all indicia. There are no erroneous legal conclusions.

C. Whether the court failed to correctly apply the "clearly mandated by law" standard to Madison's annexation, especially as regards Tract 1, which is directly in Jackson's northern path of growth.

a. The Parties' Contentions
Jackson claims that annexations which would detrimentally impact the City of Jackson must be treated differently from other annexations. In support of this proposition, Jackson relies heavily, and almost exclusively, on City of Jackson v. City of Ridgeland, 551 So.2d 861 (Miss. 1989). In short, Jackson argues that City of Jackson elevates the twelfth "other factors" indicium, when a proposed annexation will limit Jackson's future growth, to a status of greater weight and significance than the other eleven specified factors, concomitantly requiring a higher level of proof on all other factors before a proposed annexation can be found reasonable. Further constraints of Jackson's boundaries, according to Jackson, must be limited to situations where the totality of the circumstances reveals some overriding need or reason for the annexation. While Jackson does not contend that City of Jackson prohibits further growth by cities in the metro area, it claims that annexations which are not "clearly mandated by law" and which have a demonstrated detrimental impact on Jackson by limiting its growth can not be reasonable.
Jackson claims that the proposed annexation has a demonstrated detrimental impact on Jackson by limiting its northern path of growth. Because of this detriment, according to Jackson, Madison should have been required to show a clear need to expand, strong proof of path of growth, existence of potential health hazards which it intended to remedy in a reasonable time, true need for zoning and overall planning, violation of the "fair share" indicium, and similar clear, strong proof on the other indicia. In the absence of such proof, Jackson claims the entire annexation should have been denied, but particularly as to Tract 1.
Madison responds that the need to leave reasonable paths of expansion for Jackson is not an overriding, dispositive factor, but merely a consideration under the twelfth "other factors."

b. Discussion
City of Jackson did not change the proof required in annexation cases where the proposed annexation area is within Jackson's path of growth. Instead, City of Jackson merely requires that any detriment to Jackson be given great weight under the "other factors" indicium, which is what the chancellor determined in the case sub judice. As the chancellor stated here, had the proposed annexation area been immediately adjacent to the City of Jackson[11] or had Jackson indicated an intent to annex this area itself or had Jackson's path of growth to the north been completely cut off by this proposed annexation, City of Jackson may have mandated a different result. But on the facts of this particular case, the annexation was "clearly mandated by law" as all indicia of reasonableness favored annexation.
The chancellor's partial approval of the annexation is sufficiently supported by the *508 evidence presented. Accordingly, the chancellor's ruling is affirmed.
JUDGMENT IS AFFIRMED.
HAWKINS, C.J., DAN M. LEE, P.J., and SULLIVAN, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
BANKS, J., dissents with separate written opinion joined by PITTMAN, J.
McRAE, J., dissents with separate written opinion joined in part by BANKS, J.
BANKS, Justice, dissenting:
Because I believe the chancellor was manifestly wrong in concluding that the annexation of Tract 1 here involved was reasonable in the face of the countervailing consideration of the future needs of the City of Jackson as recognized by our decision in In the Matter of the Boundaries of City of Jackson, 551 So.2d 861 (Miss. 1989), I dissent.
In City of Jackson we recognized a specific concern in the Jackson Metropolitan Area which should be considered in assessing annexation. That is the potential to landlock the central city and the resulting harm to the area as a whole. We concluded that:
No doubt the hour is late, but Jackson's path of growth to the north and northwest simply must not be further constricted. We may not ignore that which we know, that a large city landlocked by the barrier of bedroom communities is destined to experience disaster. The public interest demands that we judicially enforce no such result beyond that clearly mandated by law. To be sure, no court can make a city grow and prosper, but we must do that which we judicially may. We must leave open Jackson's door to the future.
551 So.2d at 868-69.
Here the City of Jackson is not seeking to annex land. Rather it opposes annexation by a bedroom community because annexation is not justified by the facts and because the annexation has the potential for the harm identified in City of Jackson.
The plain facts are that Madison has no present need for annexation in any traditionally recognized sense. Its own expert testified that a statistical analysis of land usage would not dictate annexation activity for another nine years, if flood plain development is excluded, and even longer, if flood plain development is considered. The suggestion is that Madison needs to annex in order to "manage its growth." Growth outside Madison must be first attributed to it, however, before its need to manage can be established. Managing the growth not attributable to a city in an area which the city has no other need to annex cannot supply that need.
Significant factors identified by the trial court as bearing on the issue of path of growth simply do not support the conclusion that Tract 1 is in Madison's path of growth. The new county high school is just that, a county high school, centrally located to serve all of south and west Madison County, including the municipalities of Ridgeland and Flora, in addition to Madison. Only 22% of its students come from Madison. The new parkway west of I-55 is designed as an alternate route to and from the City of Jackson. While it should spur development, it is development dependent upon the existence of and, as the trial court found, in the path of growth of the City of Jackson, not Madison.
There are other failings when measured by our approved indicia of reasonableness, some of which are identified in the dissenting opinion entered by Justice McRae. These failings, when combined with the need to preserve northward avenues for expansion of the City of Jackson, dictate rejection of the chancellor's findings with respect to Tract 1 of the annexation here considered. Id. This is not to declare the "Jackson factor" as a super factor as the majority asserts. I only propose that we recognize the "Jackson factor" as decisive where, as here, we cannot say with confidence that a countervailing need has been established.
I am in sympathy with my Brother McRae's concern as to the proper forum for these matters, but I also recognize that annexation is a local matter, not usually given to legislative resolution without virtual unanimity in the local legislative delegation. The legislature is simply not well suited to adjudicating specific disputes. In the end some non-legislative body will have to decide *509 if we are to continue a system which recognizes municipal entities.
I dissent from so much of the majority resolutions as approves the annexation of Tract 1.
PITTMAN, J., joins this opinion.
McRAE, Justice, dissenting:
This case is a classic example of why the courts should not be the branch of government which decides the fate of cities competing for land. The fact that the City of Jackson has another annexation battle with a surrounding city is proof enough that such matters should be handled by the Legislature and not our courts. This Court has recognized that "[a]nnexation is a legislative affair, the judicial function is a matter of whether the annexation was reasonable." Matter of Extension of the Boundaries of the City of Jackson, 551 So.2d 861, 863 (Miss. 1989).
The more appropriate entity to determine whether annexations are reasonable is the legislative body. As former Justice Robertson pointed out in his concurrence in Matter of the Enlargement of the Corporate Limits of the City of Hattiesburg, 588 So.2d 814, 836 (Miss. 1991), the Legislature acts out of concern with what is best for the overall community, not as the courts do, applying legal standards, evidentiary rules and deciding for a particular party. Id. That the annexation monkey belongs to the Legislature is not a novel concept. See Marshall v. City of McComb, 251 Miss. 750, 171 So.2d 347, 348 (1965). The same should hold true today. Robertson said, "The fact is that annexation remains essentially, inherently, generically legislative in nature." Id. at 835.
Our opinions have evolved from eight indicia of reasonableness to the current popular twelve. See Matter of the Extension of the Boundaries of the City of Columbus v. Robinson, 644 So.2d 1168 (Miss. 1994); Matter of the Extension of the Boundaries of the City of Jackson v. City of Ridgeland, 551 So.2d 861 (Miss. 1989); City of Greenville v. Farmers, Inc., 513 So.2d 932, 941 (Miss. 1987); Dodd v. City of Jackson, 238 Miss. 372, 118 So.2d 319, 330 (1960). Of course, it all boils down to whether the chancellor is of the mindset to allow annexation because all he has to do is find some slim evidence to fit these court-created factors.
Furthermore, even if the chancellor pays more than lip service to these factors, there is no assurance that the annexing city will provide the higher quality of living that it purports to offer. As the majority concedes, the annexing city carries the burden of showing reasonableness by demonstrating that residents of the annexed areas will receive "something of value in exchange for their tax dollars." City of Columbus, 644 So.2d at 1172. In fact, Madison admits that it will not guarantee many items which make up the ever-powerful "indicia." First, Madison offered no plans nor expressed any intention to extend sewer lines to the areas until economically feasible. It may never be economically feasible. Second, Madison offered no planning or zoning services for the area proposed for annexation, and did not have an official comprehensive plan in compliance with the law. While the City of Jackson made no promises either, it does not have to meet the burden of proof.
The majority makes much ado about a significant landowner of the proposed area of annexation being in favor of annexation. Simply because an individual owned significant portions of land does not mean his interest should have an influence on the chancellor as the majority suggests. Because this Court has held that a person has no right to have his property annexed, it follows that his interest in being annexed should hold no influential power. Matter of Boundaries of City of Jackson, 551 So.2d 861, 863 (Miss. 1989).
The majority notes that the land that both cities are seeking to annex is approximately three to four miles away from the city limits of Jackson. This is precisely the comment which proves the point that only the landowner who objects has true standing because the twelve indicia of reasonableness are geared towards protecting landowners. The majority's attitude that Jackson is three to four miles away and therefore has no interest diminishes any objections to annexation that Jackson may have. If this matter were *510 brought before a legislative body, all parties would have an opportunity to explain why they have an interest in the territory. Currently, the burden is less stringent on Madison to prove its case.
Unless this Court leaves annexations to legislative action, there will be thorns in the state judicial system's side forever, questioning reasonableness and adding more indicia in attempt to achieve an "answer" at great expense to all litigants with no guarantees or recourse provided by the city that promises, but fails to deliver.
If we are ever to improve our system of government, we must ensure that our citizenry have a voice. Henceforth, all annexation cases should go before the Legislature where the power of the people can be heard. Accordingly, I dissent.
BANKS, J., joins in part.
NOTES
[1] Individual residents and landowners in the proposed annexation area also raised objections.
[2] At this point, the individual objectors withdrew from the case.
[3] Partial approval is specifically authorized by Miss. Code Ann. § 21-1-33 (1972).
[4] Madison has had significant development in the flood plain in past years. If flood plain land is considered developable, it would take Madison 12.5 years to build out to 75% of the available land.
[5] Lusteck, however, admitted that Northbay subdivision was located on property leased from the Reservoir.
[6] One-third of the 625 acres owned by Brown, 217 acres in the Madison Hills development, had a possible sale looming at the time of trial. Cheramie also testified that the entire Madison Hills project was available to any willing buyer and that discussions regarding the sale of this project had transpired.
[7] Somers stated that it was unlikely Jackson would provide the Proposed Annexation Area (PAA) with sewer service in the next ten years, but there was a possibility that Jackson would serve the area within the next fifteen years.
[8] Interestingly, Jackson did not file its objection to this annexation until approximately one year after receiving notice of the proceeding. Ditto explained the reason for this delay as a mistake on his part when he was just coming into office.
[9] Jackson notes that its 1985 projections for future annexation have little to do with Jackson's 1992 evaluation of its needs, and claims the 1985 map does not reflect the loss of tax base and outmigration from Jackson nor the growth in Jackson's surrounding areas since 1985.
[10] The situation presented by this case points out the need for some authority for a metro-area government.
[11] The City of Jackson is three to four miles removed from the nearest parcel to be annexed.