713 So.2d 1231 (1998)
STATE of Louisiana
v.
James Kevin WOODS.
No. 97 KA 0800.
Court of Appeal of Louisiana, First Circuit.
June 29, 1998.
Rehearing Denied August 28, 1998.
*1233 John Wayne Jewell, Donald Cazayoux, Jr., New Roads, for State of Louisiana.
C. Jerome D'Aquila, New Roads, for Defendant-Appellant James Kevin Woods.
Before LOTTINGER, C.J., and SHORTESS and FOGG, JJ.
LOTTINGER, Chief Judge.
The defendant, James Kevin Woods, was charged by bill of information with one count of armed robbery. La. R.S. 14:64. He pleaded not guilty, and after trial by jury, was found guilty as charged. The defendant was sentenced to fifty years at hard labor. A habitual offender petition was filed against the defendant charging him as a fourth felony habitual offender. After the habitual offender hearing, the court took the matter under advisement. However, pursuant to a subsequent plea agreement, the defendant later admitted to being a second felony habitual offender and was sentenced to sixty-five years at hard labor without benefit of parole, probation, or suspension of sentence. The court vacated the defendant's previous sentence. The defendant has appealed, urging six counseled assignments of error and one pro se assignment of error.

FACTS
On November 4, 1994, at approximately 1:15 p.m., the defendant entered the Guaranty Bank in Jarreau, Louisiana and robbed bank tellers Marjorie Plauche and Becky Roy of more than $6,000.00. The defendant fled the scene in a dark blue automobile. According to Plauche, the defendant wore two bandannas (one over his nose and the other over his neck and shirt), small sunglasses, brown gloves, and carried a small silver gun. The defendant pointed the gun at Plauche and Roy and threatened to kill them. The defendant subsequently was apprehended as the assailant after a man who had been with the defendant just before the robbery gave law enforcement officials information concerning the defendant's involvement in the robbery.

ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO
In assignments of error numbers one and two, the defendant contends that the trial court erred in overruling his objections, under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to the systematic exclusion of a person from the jury based on race. In his brief to this court, the defendant argues that the state peremptorily challenged seven black members of the venire. Defense counsel admits that the prosecution did offer reasons for these challenges after being instructed to do so by the court; however, he contends that the reasons were not race-neutral thus, the trial court erred in overruling his objections to the state's challenges.
In Batson, the United States Supreme Court adopted a three-step analysis to determine whether or not the constitutional rights of prospective jurors have been infringed by impermissible discriminatory practices:

*1234 First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (citations omitted).
"The second step of this process does not demand an explanation that is persuasive, or even plausible." Purkett v. Elem, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Because a trial judge's findings pertaining to purposeful discrimination turn largely on credibility evaluations, such findings ordinarily should be entitled to great deference by a reviewing court. Batson v. Kentucky, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. Reasons offered to explain the exercise of peremptory challenges should be deemed race-neutral unless a discriminatory intent was inherent in those reasons. See Hernandez v. New York, 500 U.S. at 359, 111 S.Ct. at 1866.
Our careful review of the entire record of the voir dire proceedings fails to disclose any error in the rulings of the trial court. Initially, we note that there is no evidence in the record that any of the prospective jurors were questioned as to their race. The only indication of race is defense counsel's statement in his brief to this court that the prospective jurors in question were black. Further, there was no indication in the record of the racial composition of the actual jurors.
Toward the end of voir dire, defense counsel made a Batson objection to the prosecution's peremptory challenges of five particular prospective jurors from the previous panels. Without the trial court ruling as to whether or not the defendant had established a prima facie case under Batson, the court asked for the prosecution's reasons for the challenges. In regard to Robert Bergeron, the prosecutor stated that although Bergeron indicated that the prosecutor represented him in a lawsuit, the prosecutor explained that Bergeron was mistaken, as he has corresponded with Bergeron but that he represented a party in an ongoing lawsuit whom Bergeron "did work for and not him."
The court then stated that Joann Toulouse, another juror peremptorily challenged by the prosecutor, was nervous at the beginning and "at one point stated something about not wanting to judge her fellow man, but kind of recanted that and I think that's a racially neutral reason." In regard to Kenneth Temple, the prosecutor stated that he worked at Angola, his sibling was married to one of the state's witnesses, and because he worked in the prison system he stated that he has followed inmates around and "seen D.A.'s tear them up in the Courtroom and make them say things they didn't want to say." The court further indicated that Temple stated that if he were a defendant, he would not want anyone connected with any type of law enforcement or corrections being a member of his jury.
In regard to Serena Smith McClean, the prosecutor proclaimed that she had stated some of her adult children had been in trouble, and incarcerated in Orleans Parish and she indicated that she did not know how she would feel about convicting someone. In regard to Joseph Early, the court and the prosecutor stated that Early stated that he had been awake all night and when the prosecutor asked him if he had ever been in trouble with the law, he responded, "Not really." The court then denied the defendant's Batson objection stating it felt the state had given "more than ample" racially neutral reasons for the challenges.
Subsequently, defense counsel made a Batson objection to two more prospective jurors peremptorily challenged by the state. Without a ruling from the court as to whether or not there was a prima facie case under Batson, the state responded that with regard to Shirley Epps, she stated that she had a family member that had been in trouble, but the case had been dismissed. The prosecutor stated that the situation bothered him because sometimes in that type of scenario *1235 someone might believe the person was picked up for no reason. The prosecutor also noted that when he asked Epps a standard question regarding believing police officers over non-police officers "[s]he almost had to fight back the laughter." The trial judge then indicated that he saw Epps rolling her eyes.
In regard to Mary Lenette Bazile, the prosecutor stated that he felt that there would be a problem because Bazile indicated that she knew two of the state's witnesses, one of whom the prosecutor stated that they were going to have to impeach. The court then denied the defendant's Batson objection.
According to the record, the defense failed to establish a prima facie case of discrimination. See State v. Ross, 95-1240, pp. 5-6 (La.App. 1st Cir. 5/10/96), 674 So.2d 489, 492-93. Although the defendant failed to meet his burden under step one, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez v. New York, 500 U.S. at 359, 111 S.Ct. at 1866.
The reasons given by the state for exercising the peremptory challenges of the prospective jurors in question are facially "race-neutral." They contain none of the cultural, geographic, or linguistic classifications which, due to the ease with which such classifications may serve as a proxy for an impermissible classification, invite particularly exacting scrutiny. Cf. Hernandez v. New York, 500 U.S. at 363, 111 S.Ct. at 1868 (wherein a prosecutor's striking of Spanish-speaking jurors "raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges"). Hence, we conclude that none of the reasons articulated by the state are readily associated with the suspect class which is alleged to be the object of the state's discriminatory use of peremptory strikes, i.e., prospective black jurors.
For these reasons, we find that the state sustained its burden of articulating "race-neutral" reasons for the exercise of the peremptory strikes at issue. Whether these reasons are substantial and, more importantly, whether they are substantiated by the record, is a question to be determined in the third stage of the Batson analysis. See State v. Green, 94-0887, p. 27 (La.5/22/95), 655 So.2d 272, 289. Reviewing courts owe the trial judge proper deference in assessing the credibility of in-court testimony. Thus, the proper inquiry in this final stage of the Batson analysis is not whether the state has disproved the existence of purposeful discrimination suggested by a defendant's prima facie case; rather, the question is whether a defendant's proof, when weighed against the prosecutor's offered "race-neutral" reasons, is strong enough to persuade the trier-of-fact that such discriminatory intent is present. Any other approach would violate the principle that the ultimate burden of proving racially motivated strikes in violation of Batson rests with the opponent of the strike. See State v. Green, 94-0887 at p. 29, 655 So.2d at 290.
After carefully reviewing the entire record of voir dire, we find no abuse of discretion or error by the trial court in its denial of the defendant's Batson objections. The trial court heard the prospective jurors and the prosecutors. The court obviously concluded that there were reasonable bases for the challenges in question. Although the defendant contests some of the reasons offered by the state for the challenges and contends that these reasons were not race-neutral, we fail to find anything in this record to show that the state employed a tactic of purposeful racial discrimination in its exercise of peremptory challenges in this case. See State v. White, 96-0592, pp. 3-8 (La.App. 1st Cir. 12/20/96), 686 So.2d 96, 98-101. These assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER THREE
In assignment of error number three, the defendant contends that the trial court erred in overruling his motion for mistrial. In his brief to this court, the defendant alleges that the prosecution failed to promptly notify the defense of one of the victim's prior identification *1236 of the defendant and this surprise testimony significantly strengthened the state's case. Defense counsel contends that, had he known about the identification, different tactical considerations would have been made. Thus, because of the state's failure to abide by its continuing duty to disclose any additional evidence that is subject to discovery, the defendant was deprived of his right to a fair trial.
Marjorie Plauche, a bank teller who was one of the victims of the robbery, gave a description of her assailant and stated that she was able to get a look at part of his face. The prosecutor then asked her, "Did you see that person, who robbed you, since the time of that robbery?" Plauche responded, "I saw him when I came for the preliminary hearing in April." The prosecutor asked, "Is that April 19th, 1995?" Plauche responded, "Yes. I saw him and when I walked in the Courtroom, I think they were in this Jury room and hethey had several people and they were peeking out one at a time and when put his head out, I knewI recognized him right away." The prosecutor then asked, "And you identified him?" Plauche answered, "Yes." At this point defense counsel objected, stating that the state failed to lay a proper foundation for the identification and that he had not heard about the identification of which she was speaking. He contended that the defense was prejudiced by the testimony of this identification because there was no information in the file or testimony at the preliminary examination regarding this identification. Out of the presence of the jury, the prosecutor, Mr. Jewell, stated that he had not heard the testimony before and that her testimony was only in response to a general question by him. Another prosecutor, Mr. Ward, stated that the witness told another prosecutor, Mr. Cazayoux, the preceding day and Cazayoux just conveyed it to Jewell, who asked the question. Ward indicated that they did not know what the answer would be. He further contended that defense counsel knew that Plauche was one of the state's witnesses and that they could have asked her the same question. Defense counsel agreed. Ward further stated that in response to the discovery request, they would not have disclosed the specifics of Plauche's testimony, but only that she could identify the defendant, which he claimed the defense already knew. The court asked if Plauche positively identified the defendant at the preliminary examination. Jewell responded that she positively identified him in open court and that the identification in question happened approximately five minutes prior to her in court identification. He stated that her testimony was simply cumulative of the testimony of that day. Cazayoux stated that, in order to show that there were no tricks, he would read to the court the note that he had just written to Jewell. The note stated, "Before identifying Woods in Court she i.d.'d him." Cazayoux indicated that Jewell did not know that she had made another identification before he asked her the question. The court responded that it did not find any prejudice, overruled defense counsel's objection, and denied his motion for a mistrial.
The discovery rules of the Louisiana Code of Criminal Procedure require the court, upon the defendant's motion, to order the district attorney or the appropriate law enforcement agency "to furnish to defendant a copy of any record of his criminal arrests and convictions that is in their possession or custody." La.Code Crim.P. art. 717. Article 729.3 requires a party to promptly notify the other party and the court of the existence of additional evidence discovered after compliance with an earlier discovery order. The court may impose sanctions when it is brought to its attention that a party has failed to comply with discovery and inspection or an order issued pursuant thereto. La.Code Crim.P. art. 729.5(A). These sanctions include ordering the party to permit the discovery or inspection, granting a continuance, ordering a mistrial (on the defendant's motion), excluding the evidence, or entering such other order, other than dismissal, as may be appropriate. La.Code Crim.P. art. 729.5(A). Article 729.5 is permissive and does not mandate any particular remedy. Mistrial is a drastic remedy which should be granted only when the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. Failure to comply with discovery *1237 merits a mistrial only when the state's conduct substantially affects the defendant's right to prepare a defense. State v. Selvage, 93-1435, pp. 5-6 (La.App. 1st Cir. 10/7/94), 644 So.2d 745, 750, writ denied, 94-2744 (La.3/10/95), 644 So.2d 1174.
The articles regulating discovery are intended to eliminate unwarranted prejudice which could arise from surprise testimony. Discovery procedures enable the defendant to properly assess the strength of the state's case against him in order to prepare his defense. If a defendant is lulled into a misapprehension of the strength of the state's case by the failure to fully disclose, such prejudice may constitute reversible error. The state's failure to comply with discovery requests does not constitute reversible error unless actual prejudice results to the defendant. State v. Selvage, 93-1435 at p. 6, 650 So.2d at 750.
In the instant case, the state indicated that one of the prosecutors found out about this identification the day before the witness testified and did not communicate the information to the prosecutor questioning Plauche until her actual examination. That prosecutor indicated that he was only asking her general questions regarding her positive identification of the defendant in open court at the preliminary hearing when she testified regarding her prior identification. While one of the prosecutors knew of this identification the day before Plauche's testimony, we are unable to find that the defendant suffered actual prejudice due to the state's failure to provide the defense with this particular information as the defense was aware that during the preliminary hearing, Plauche positively identified the defendant in court as her assailant.
After reviewing the record, we find that the state's failure to timely provide the defense with this information is not reversible error. The defense was aware that Plauche had made a positive identification of the defendant and she had testified at the preliminary examination that she had gotten a look at his face. The defendant was also identified by two other state's witnesses. Thus, the defense was aware that the defendant had been positively identified as the assailant and it is not likely that the defense strategy would have changed due to information regarding a second identification by Plauche at the preliminary hearing. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER FOUR
In assignment of error number four, the defendant contends that the trial court erred in its jury instruction regarding the use of a toy gun. In his brief to this court, the defendant argues that the court erred in overruling his objection to the prosecution's special instruction regarding the use of a toy gun. He contends that this special instruction should not have been read to the jury because it required qualification, limitation, and explanation for the jury to understand. He argued that this instruction without any further explanation created a strong probability of confusion amongst the jurors, particularly since the jurors asked to hear this instruction twice more after its initial reading.
The state's special charge objected to by the defense contained the following language:
A toy gun may be a dangerous weapon for purposes of Armed Robbery prosecution if the Jury finds that the interaction between the offender and the victim created a highly charged atmosphere where there was a danger of serious bodily harm resulting from the victim's fear for [sic] his life.
This special charge was read in conjunction with the definition of a dangerous weapon. Subsequently, the jurors returned to the courtroom with a request that the court read the instructions regarding all the possible verdicts. In reading this instruction, the court included the instruction regarding the toy gun. The jurors later returned to the courtroom and requested the court to reread the instruction on the toy gun.
La.Code Crim.P. art. 802 mandates that a trial court shall charge the jury as to the law applicable in the case. The charge objected to by the defendant was a special charge requested by the state. A requested special charge shall be given by the court if it does not require qualification, limitation or explanation, *1238 and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge which is given. La.Code Crim.P. art. 807.
This charge came directly from State v. Cittadino, 628 So.2d 251, 255 (La.App. 5th Cir.1993). The Cittadino court, citing State ex rel. Richey v. Butler, 572 So.2d 1043 (La. 1991), concluded that the plastic gun used by the defendant to facilitate the robbery constituted a dangerous weapon sufficient to convict the defendant of armed robbery.
Because there was evidence presented that the gun used by the defendant in the instant case might have been a toy gun, the instruction was pertinent and correct. The charge was not included in the general charge and did not require qualification, limitation, or explanation. Although the jurors requested that the court reread this particular instruction, there did not appear to be any confusion amongst the jurors which indicated a need for further explanation. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER FIVE
In his fifth assignment of error, the defendant contends that the trial court erred in denying the defendant's motion for a new trial. In his brief to this court, the defense counsel contends that the state failed to present sufficient evidence proving every element of the crime sufficient to establish the defendant's guilt beyond a reasonable doubt. He contends that the defendant's identity was not proven beyond a reasonable doubt as the testimony from the state's witnesses was inconsistent and there was no direct evidence linking him to the crime. Defense counsel further contends that there was evidence presented that a toy gun was used in the robbery, and although jurisprudence has indicated circumstances where a toy gun would rise to the level of a dangerous weapon, those circumstances were not present in the instant case as such a hostile environment which would cause a toy gun to be considered a dangerous weapon was not created during the commission of the crime.
The standard of review for the sufficiency of evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime and the defendant's identity beyond a reasonable doubt. See La.Code Crim.P. art. 821; State v. King, 563 So.2d 449, 456 (La. App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990); State v. Johnson, 461 So.2d 673, 674 (La.App. 1st Cir.1984). The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review incorporated in Article 821 is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La.R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. McLean, 525 So.2d 1251, 1255 (La.App. 1st Cir.), writ denied, 532 So.2d 130 (La.1988). Where the key issue raised by the defense is the defendant's identity as the perpetrator, the state is required to negate any reasonable probability of misidentification. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir.1984).
The testimony of the victim alone is sufficient to prove the elements of the offense. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Johnson, 529 So.2d 466, 472 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989). This court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Polkey, 529 So.2d 474, 476 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989).
La.R.S. 14:64 defines armed robbery as the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. According to La. R.S. *1239 14:2(3), dangerous weapon includes any gas, liquid, or other substance or instrumentality, which, in the manner used is calculated or likely to produce death or great bodily harm.
A toy gun can be considered a dangerous weapon if the jury determines that the interaction between the offender and the victim created a highly charged atmosphere whereby there was a danger of serious bodily harm resulting from the victim's fear for his life. State v. Cittadino, 628 So.2d 251, 255 (La.App. 5th Cir.1993).
In the instant case, Marjorie Plauche testified that she and Becky Roy were the only two people in the bank when the defendant entered. Although the defendant was wearing bandannas and sunglasses, she was able to see part of his face. According to Plauche, the defendant pointed a gun at her and told her that he would kill her if she looked at him and that if she pressed the alarm button he would kill her. After he received the money, the defendant told Plauche and Roy to lay on the floor and count backward from one hundred. Plauche stated that she only squatted because she did not think he would return. As soon as she heard an automobile motor, Plauche ran to the bank door and saw a blue car speeding away with one person in the car. Roy called the sheriffs office and reported the crime. Plauche identified photographs taken of the assailant by a camera in the bank. She also identified gloves and bandannas worn by the defendant. Plauche stated that she was shown a picture of a gun at the preliminary hearing but she was unable to identify the gun in the photograph as the gun used in the robbery. She explained that she was only able to see the shiny barrel of the gun because of the way he held the gun.
Plauche stated that she did not know if the defendant had his finger on the gun's trigger; she thought that the gun was real. Plauche described the assailant as neat in appearance, having a round face, and that he was somewhat polite. According to Plauche, the defendant was in the bank approximately three minutes and she had a number of opportunities to look at him. Plauche identified the defendant at the preliminary hearing and at trial as being the person who robbed her.
Becky Roy testified that she was working with Plauche at the Guaranty Bank on November 4, 1996. She and Plauche were the only workers in the bank when the defendant entered the bank. Roy stated that she was doing paperwork and had her back turned toward the door. When Roy turned around, there was a man standing in front of her wearing bandannas and sunglasses and pointing a gun toward her and Plauche. Roy stated that she was standing near Plauche. He told them to give him the money and not to look at him or press any buttons or he would kill them. He told Plauche not to move. Roy stated that she "really got scared more than normal because he kept saying, `I'm gon'na kill you.'" Roy stated that he kept telling her to hurry and at one point told Plauche "I told you not to move" and "I'm gon'na kill you." According to Roy, it was as if the defendant was going to "come across the counter" and she was "so scared." She was unable to remember giving him the bag of money but she stated that as he was leaving he told them to lay on the floor and count backwards from one hundred. Roy stated that she "hit the floor."
According to Roy, the bank's camera was activated by a switch when she pulled "bait money" and put it in the bag. Roy identified several photographs taken with the bank's camera. She stated that the gun was silver and pointed it out in the photographs. According to Roy, the gun was small but all she could see was the barrel. Roy stated that she thought it was similar to a derringer and that she used to own a derringer. According to Roy, the gun did not appear to be a toy gun. She further identified state exhibit 4 and identified the bandannas and gloves as looking exactly like the items worn by the assailant. She described the assailant as a black male, approximately 27 years old, 5'7" and 140-150 pounds. Roy indicated that she was able to look at the defendant a number of times. She identified the defendant in court as the person who robbed her. Roy stated that she was "scared half to death" and indicated that she had never been robbed before.
*1240 Anthony Wilson testified that he knew the defendant as he was married to his cousin. On November 3, 1994, at approximately 6:00 p.m., Wilson went to New Roads with the defendant in a blue Topaz automobile that belonged to the defendant's girlfriend. The men spent the night in New Roads and the following morning they purchased gasoline for the car and then returned a battery from the car to Wal-Mart because, according to Wilson, the defendant needed money. The defendant obtained a battery for the car from a friend. Wilson and the defendant then rode around and drank beer. According to Wilson, the defendant talked about robbing the bank. The defendant bought bandannas, gloves, and a toy gun. Wilson identified the gloves and bandannas in state exhibit 4 as resembling the items bought by the defendant. According to Wilson, the gun that the defendant bought looked like a small .38. The gun was shiny and silver.
At approximately 11:30 a.m., the defendant and Wilson went to the home of Diana Bourgeois in order to visit his infant son, but Bourgeois made them leave. Subsequently, the defendant drove around the bank three or four times in order to see who was inside. Wilson stated that he tried to talk the defendant out of the robbery. Because he was unable to convince the defendant not to go through with the robbery, he asked the defendant to let him get out of the car. The defendant dropped Wilson off near the bank. He began walking away, but saw the defendant enter the bank wearing a white T-shirt, a bandanna, and glasses. He subsequently saw the defendant exit the bank, walking fast, and get into a blue Topaz. Wilson did not know what happened after that because he caught a ride back to Baton Rouge.
Wilson talked to the defendant the following day but only for a minute. Wilson subsequently decided to contact the police and tell them what he knew before anyone implicated him in the crime. Wilson stated that he was 6'1" and was 33 years old.
The law enforcement officers showed him a photograph which was faxed from New Roads to Baton Rouge and he stated that the photograph resembled the defendant. Wilson subsequently was given a book with a few hundred pictures in it and he picked the defendant from the book.
Detective L.J. David of the Pointe Coupee Parish Sheriffs Office investigated the instant crime. He found a T-shirt, two bandannas, and gloves near the bank. According to David, no sunglasses or money were recovered. David stated that when Wilson picked the defendant from the book of over five hundred suspects, any other suspects were eliminated.
Detective Brett Robillard of the Pointe Coupee Parish Sheriff's Office testified that he also investigated the crime and went to the crime scene where he took statements from the bank tellers. On November 8, 1994, he received a telephone call regarding a suspect in the crime. Robillard met with Wilson and later attempted to verify Wilson's statement by going to all the places of business that Wilson told him about. Robillard stated that he was able to verify Wilson's story. According to Robillard, the defendant was 29 years old, 5'6", and 160 pounds.
On cross-examination, Robillard identified a photograph of a gun that he took at Wal-Mart in New Roads. He stated that the gun resembled the description of the gun given to him by Wilson and allegedly used in the robbery. Robillard admitted that Wilson initially identified someone other than the defendant as being the person that robbed the bank, but it was from a poor quality faxed photograph/. Stacy Gremillion, a representative from Wal-Mart, testified that the defendant's name was on an automotive receipt dated November 4, 1994, 8:39 a.m. The receipt was for a battery refund.
Diane Bourgeois testified that her daughter, Tammy, knew the defendant and that Tammy and the defendant had a child together. The defendant did not live with them, but he did stop by their house on November 4, 1994, at approximately 11:00 a.m. in order to see the child. The defendant was driving a blue Topaz that belonged to Shannon Jasmine and was with a man that Bourgeois did not know. Bourgeois talked to the defendant, but he was not allowed inside her house. Tammy was not present.
*1241 Shannon Jasmine testified that she lived with the defendant and identified him in court. She owned a Topaz automobile which, she identified as being pictured in S-1. According to Jasmine, the defendant frequently borrowed her car. A battery was purchased for her car at one point at Wal-Mart. She was unaware that the battery was returned to the store until the detectives looked in her car and she saw a battery from Western Auto.
Detective Jerome Fontenot of the Pointe Coupee Parish Sheriffs Office was called to testify as a witness for the defense. He helped David in the investigation to verify Wilson's statement. He stated that he initially looked for a real gun until Wilson indicated that a toy gun was used in the robbery. He was not aware that any gun was ever found. According to Fontenot, when the defendant was arrested, the money that was found on his person did not match the money that was taken from the bank.
In the instant case, the defendant was identified as the assailant by the two tellers and by Wilson. While there was some question regarding Wilson's initial identification of the defendant from a photograph, Wilson did pick the defendant's photograph from a book of hundreds of suspects. According to David, the other suspect in question was also in that book. Wilson testified that the defendant talked of robbing the bank and the defendant bought bandannas, gloves, and a gun. Wilson observed the defendant enter the bank wearing the bandannas and gloves and he also saw the defendant exit the bank very quickly shortly thereafter.
Furthermore, although the defendant contends that a toy gun was used in the robbery and thus he could not be convicted of armed robbery, we disagree. Initially, we note that no weapon was recovered. While there was some indication a toy gun may have been used, based on Wilson's statement, both Plauche and Roy testified that they thought the gun was real. Moreover, even if the gun had been a toy gun, Plauche and Roy testified that the defendant pointed the gun at them and threatened to kill them. Roy testified that she was "scared half to death" and thought that the defendant was going to kill her. Thus, we find that the interaction between the defendant and the victims created such a highly charged atmosphere that there was a danger of serious bodily harm resulting from the victim's fear for her life. See State v. Cittadino, 628 So.2d at 255.
The guilty verdict returned in this case indicates that, after considering the credibility of the witnesses and weighing the evidence, the jury accepted the testimony of the state's witnesses and rejected that of the defense's witnesses. This court will not assess the credibility of the witnesses or reweigh the evidence.
After reviewing the record, we are convinced that the evidence supports the jury's determination. We are convinced that a rational trier of fact, viewing all the evidence as favorable to the prosecution as any rational fact finder can, could have concluded that the state proved beyond a reasonable doubt the elements of armed robbery and the defendant's identification as the perpetrator to the exclusion of every reasonable hypothesis of innocence and negated any reasonable probability of misidentification. The trial court did not err in denying the defendant's motion for a new trial. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER SIX
In his sixth assignment of error, the defense counsel contends that the defendant's sentence was excessive. Based on the record before us, the defendant is precluded from challenging his sentence on appeal. A defendant cannot appeal or seek review of a sentence imposed in conformity with a plea agreement. La.Code Crim.P. art. 881.2(A)(2).
The defendant originally was sentenced to fifty years imprisonment at hard labor. He subsequently was charged as a fourth felony habitual offender but pursuant to a plea agreement that he would be sentenced to sixty-five years at hard labor, he pled guilty to being a second felony habitual offender. The defendant was sentenced to the agreed upon sentence and the court vacated the original sentence. Therefore, the defendant *1242 is precluded from seeking review of his sentence as it was imposed in conformity with the plea agreement set forth at the time of his plea. See State v. Young, 96-0195, p. 7 (La.10/15/96), 680 So.2d 1171, 1175; State v. Lewis, 633 So.2d 318, 321 (La.App. 1st Cir. 1993). Thus, we do not consider the defendant's claim of excessiveness. This assignment of error is without merit.

PRO SE ASSIGNMENT OF ERROR
The defendant contends in his pro se assignment of error that the trial court erred in refusing to grant a mistrial or a continuance upon allowing an amendment of the bill of information after the trial began. In his brief to this court, the defendant contends that the bill of information was defective as it named the victim of the armed robbery as the Guaranty Bank. Thus, he claims the court erred in allowing the state to make a substantive amendment to the indictment by changing the name of the victim from the Guaranty Bank to the two tellers at the bank.
According to the record, the bill of information originally stated, "... did unlawfully violate R.S. 14:64 by robbing the Guaranty Bank, located in Jarreau, LA, of $6,185.00, while armed with a dangerous weapon, to-wit; a small caliber handgun...." On March 12, 1996, after the jury was sworn in and prior to the beginning of witness testimony, the state amended the bill of information to read, "... did unlawfully violate R.S. 14:64 by robbing the [SIC] MARJORIE PLAUCHE & BECKY ROY, employees of Guaranty Bank...."
At the hearing, the prosecutor made a motion to make a technical amendment of the bill of information. Defense counsel then made a motion for a mistrial under La.Code Crim. P. art. 487 due to a defective indictment. He argued that changing the victim's name was a substantive defect as although the bill read armed robbery, because a building was listed as the victim, the crime could have been misconstrued as burglary. Thus, he argued by changing the victim, the state was in essence changing the charge which he felt was prejudicial to the victim. In denying the defendant's motion and allowing the amendment, the court stated that the defect was technical. The court noted that only the victim's names were omitted from the bill and a preliminary examination was held regarding the instant case.
La.Code Crim.P. art. 464 provides as follows:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
La.Code Crim.P. art. 473 provides as follows:
When the name of the person injured is substantial and not merely descriptive, such as when the injury is to the person, as in murder, rape, or battery, the indictment shall state the true name of the victim or the name, appellation, or nickname by which he is known. If the name, appellation, or nickname of the victim is not known, it is sufficient to so state and to describe him as far as possible. In stating any name of a victim it is sufficient to state a surname, a surname and one or more given names, or a surname and one or more abbreviations or initials of a given name or names.
It has been consistently held that where an accused has been fairly informed of the charge against him by the indictment and has not been prejudiced by surprise or lack of notice, the technical sufficiency of the indictment may not be questioned after conviction where no objection was raised to it prior to the verdict and where, without unfairness, the accused may be protected against further prosecution for any offense or offenses charged by it through examination of the pleadings and the evidence in the instant prosecution. State v. Folse, 623 So.2d 59, 64 (La.App. 1st Cir.1993).
In the instant case, prior to its amendment, the bill of information clearly stated that the defendant was being charged with *1243 armed robbery. The bill gave the date and location of the robbery, the amount of money taken, and the type of weapon used. While the bill did list the Guaranty Bank as the victim which was robbed, a preliminary examination was held wherein the two tellers at the bank testified that they were the victims of the robbery. Considering the above, we are unable to find that the defendant was prejudiced by the amendment of the bill of information. Accordingly, the trial court did not err in allowing the state to amend the bill of information. This assignment of error lacks merit.
CONVICTION AND SENTENCE AFFIRMED.